512 A.2d 1152

COMMONWEALTH of Pennsylvania, Appellee,

v.

Raymond WHITNEY, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 23, 1985.

Decided July 15, 1986.

234

Thomas W. Moore, Philadelphia, for appellant.

Robert B. Lawler, Chief/Appeals Div., William Boland, Arnold H. Gordon, Asst. Dist. Attys., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

McDERMOTT, Justice.

The appellant, Raymond Whitney, was convicted by a jury of two counts of burglary[1], two counts of robbery[2], two counts of possession of an instrument of crime—generally[3], terroristic threats[4], indecent assault[5], attempted rape[6], and murder in the first degree[7]. These crimes were committed during an episode in which appellant invaded two adjoining homes. He robbed the occupant of the first home at knife point. He attempted to rape the female occupant of the second; he murdered the male occupant by the infliction of twenty-eight stab wounds. Following the jury's rendition of the verdicts of guilt a sentencing hearing was conducted in accordance with Section 9711 of the Sentencing Code[8], 42 Pa.C.S. § 9711, resulting in a determination by the jury that the appellant should be sentenced to death. Post-verdict motions were denied and appellant was formally sentenced to death in connection with the first degree murder convic-

1. 18 Pa.C.S. § 3502
2. 18 Pa.C.S. § 3701
3. 18 Pa.C.S. § 907(a)
4. 18 Pa.C.S. § 2706
5. 18 Pa.C.S. § 3126
6. 18 Pa.C.S. § 901, 3121
7. 18 Pa.C.S. § 2502(a)
8. Act of March 26, 1974, P.L. 213, No. 46, § 3, *as amended.*

tion in accordance with the jury's findings [9]. Direct appeal from the judgment of sentence was taken to this Court. *See* 42 Pa.C.S. § 9711(h)(1) and § 722(4).

■ It is the practice of this Court in death penalty cases to review the sufficiency of the evidence to sustain the conviction of murder in the first degree whether or not the appellant contests the issue. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The test to be applied in such review is whether, viewing all of the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976).

■ The evidence adduced at trial disclosed that shortly before 4:00 A.M. on October 10, 1981, a man gained access to the second floor apartment of Juliana Minor through a window. The man, identified later that night by Ms. Minor as appellant, came into her bedroom where she lay in bed. Armed with a knife, he threatened to kill her if she wasn't quiet. He asked if she recognized him; she responded that she didn't. He then announced that he was in the "wrong" apartment. Nonetheless, he stole items from her jewelry box, cut her telephone wire, and soon thereafter left through a window onto a ledge.

Moments later appellant entered the apartment of Jehad Taha and Mahin Murtaza, husband and wife, just two doors away from Ms. Minor's apartment on the same floor. Realizing that someone was in the apartment, Mr. Taha got out of bed and went to the living room to investigate. Mrs.

9. In addition to the death sentence, appellant was sentenced to consecutive terms of imprisonment on the remaining convictions totalling forty-one years five and one-half months to eighty-two years eleven months. The terroristic threats conviction merged with one of the robbery convictions.

Murtaza heard someone hit her husband and she attempted to contact the police on the bedroom phone. Before she was able to get through she saw her husband at the bedroom door, blood running from his chest and face, with appellant standing behind him holding a knife to his neck. As Mrs. Murtaza hung up the phone appellant threw Mr. Taha to the bed and approached Mrs. Murtaza, holding his knife to her chest. Appellant demanded money and jewelry. She gave him jewelry from a candle case; appellant forcibly removed what jewelry the victims were wearing. He then announced his desire to rape Mrs. Murtaza and tore off her brassiere. Before carrying these intentions further he repeated his demand for money, and was told by Mrs. Murtaza that their money was in the living room in her purse. Appellant ordered Mr. Taha up from the bed and pushed him toward the living room. Still bleeding Mr. Taha headed for the bathroom, at which point appellant attacked and stabbed him again. Appellant forced Mr. Taha into the living room where Mrs. Murtaza emptied the small amount of change in her purse onto the floor. Appellant expressed his disappointment. In a relaxed and "very cool" manner he opened the refrigerator, took out a glass container and drank some water. Then he advanced on Mrs. Murtaza, hugged her, touched her breast and reiterated his intent to have intercourse with her. He struck her and threw her to the floor next to her husband. Mr. Taha protested, but was struck in the face and ordered to put his neck down. Appellant then stabbed him again and repeatedly stated that he was going to kill Mr. Taha and then would rape her. At this point appellant opened his pants and drew out his penis. Mr. Taha arose and began to scuffle with appellant; Mrs. Murtaza ran out of the apartment and onto the street where she saw two police officers, Sergeant Wagner and Officer Miller. She directed them to the apartment where the police officers observed appellant crouched over Mr. Taha pulling a knife out of Taha's chest. Appellant was immediately arrested. Mr. Taha died subsequently as a result of twenty-eight stab wounds to his body.

We are satisfied that the evidence is sufficient to support the jury's verdict of guilt.

Although he did not contest the sufficiency of the evidence appellant does contend that the weight of the evidence clearly established his diminished capacity due to intoxication, and therefore negated his intent to commit first degree murder.

■ Voluntary intoxication is not a defense to a criminal charge. However, evidence of alcohol or drug intoxication may be introduced in a murder case to negate the element of specific intent and thereby reduce the crime to a lesser degree of murder. 18 Pa.C.S. § 308 [10]; *Commonwealth v. Coleman*, 482 Pa. 581, 394 A.2d 474 (1978); *Commonwealth v. Graves*, 461 Pa. 118, 334 A.2d 661 (1975).

In support of his position appellant cites the testimony of defense witnesses that he had been drinking and had become intoxicated at a party earlier that evening. In addition, Ms. Minor had stated that appellant's walk was "woozy" and she thought his speech was "funny". The police officer who transported appellant to police headquarters testified that he smelled alcohol on his breath.

■ On the other hand, there was substantial evidence that appellant had the capacity to possess the specific intent to murder Jehad Taha. First of all, he had sufficient command of his body to allow him to travel along the second floor ledge of the apartment building, to think about stealing valuables from Ms. Minor and cutting the phone wire despite realizing he was in the "wrong" apartment. He demonstrated the capacity of mind to direct Mrs. Murtaza as to how to respond when an operator called during the incident. Furthermore, Sergeant Wagner and Officer Mil-

**10.** Section 308 of the Crimes Code, 18 Pa.C.S. § 308, provides:

> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negate the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, *as amended.*

ler both testified that while at the scene appellant did not stumble or stagger; and neither detected any odor of alcohol on his breath, nor believed that he was under the influence of alcohol.

Whether appellant lacked the capacity to possess the requisite specific intent was an issue for the jury. *Commonwealth v. Colbert,* 476 Pa. 531, 383 A.2d 490 (1978). A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *See: Commonwealth v. Datesman,* 343 Pa.Super. 176, 494 A.2d 413 (1985); *Commonwealth v. Sample,* 321 Pa.Super. 457, 468 A.2d 799 (1983). The trial court's decision on such a motion for new trial is committed to its sound discretion and an appellate court will not disturb its decision absent an abuse of that discretion. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982). The jury's decision that appellant possessed the specific intent to commit murder, inherent in its verdict, is supported by substantial evidence. *See Commonwealth v. Fairell,* 476 Pa. 128, 381 A.2d 1258 (1977). The trial court did not abuse its discretion in denying a new trial on these grounds.

■ Appellant also asserts that he lacked the requisite mental capacity to make an intelligent, informed, knowing and voluntary waiver of his *Miranda* rights[11]. Accordingly, he contends that the court erred in refusing to grant his motion to suppress an incriminating statement given to the police hours after the crime.

In *Commonwealth v. Cortez,* 507 Pa. 529, 491 A.2d 111 (1985), our standard of review of defendant's appeal of an adverse suppression ruling was described as follows:

When we review the ruling of a suppression court we must determine whether the factual findings are sup-

11. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Id.*, 507 Pa. at 532, 491 A.2d at 112.

At the suppression hearing appellant presented testimony from two friends who stated he was drunk at a party earlier that evening. On cross-examination the officer who transported appellant to police headquarters testified that he smelled alcohol on appellant's breath. In addition, the defense called a clinical psychologist, Dr. Gerald Cooke, to testify as to the appellant's mental state. Dr. Cooke testified that when he went over the *Miranda* warnings with appellant, he did have a basic concrete understanding of the warnings and rights, but because of his borderline intellectual range and lack of social skills, he was incapable of implementing them, particularly if he had been drinking and was under great stress.

The Commonwealth rebutted this evidence with testimony from Sergeant Wagner and Officer Miller, the officer who transported appellant, and the two detectives to whom appellant issued his incriminating statement. All testified that appellant did not exhibit any signs of intoxication. The detectives testified that appellant demonstrated a clear understanding of his *Miranda* rights, and responded to questioning in a manner that reflected a clear comprehension of the questions posed. They further testified that appellant told them he had been drinking but stated that he was not drunk.

Resolution of any conflict between the testimony of the parties was for the factfinder to resolve, and we are bound by that determination if there is adequate support on the record. Clearly the suppression court's decision was ultimately based on a finding that the Commonwealth witness-

es were more credible. Such a credibility determination is within the judge's province and we cannot reverse where, as here, his findings are supported by the record. *Cortez, supra; Commonwealth v. Gray,* 473 Pa. 424, 374 A.2d 1285 (1977).

■ As to appellant's contention that he was not intellectually capable of waiving his rights, we have consistently refused to adhere to a *per se* rule of incapacity to waive constitutional rights based on mental deficiencies. *Commonwealth v. Hicks,* 466 Pa. 499, 353 A.2d 803 (1976). The fact that a defendant has a low I.Q. does not in and of itself render his confession involuntary. *Commonwealth v. Glover,* 488 Pa. 459, 412 A.2d 855 (1980); *Commonwealth v. Crosby,* 464 Pa. 337, 346 A.2d 768 (1975). The line of distinction between a voluntary and an involuntary confession is that at which governing self-direction is lost and compulsion propels the confession. *Commonwealth v. Ritter,* 462 Pa. 202, 340 A.2d 433 (1975); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974). However, an internal compulsion to confess resulting from mental disease or deficiency does not make the resulting confession inadmissible. *Commonwealth v. Bracey,* 501 Pa. 356, 461 A.2d 775 (1983).

We look at all of the circumstances to determine if a knowing and intelligent waiver was effected. *Hicks, supra.* Appellant demonstrated that he was capable of self-direction at the time he made the statement. During the statement appellant refused to divulge the name of a person he had originally planned to meet in the early morning hours when the incident occurred, stating that he was not going to involve him in something he had nothing to do with. Moreover, appellant refused to sign the statement after it was read to him. There was no indication of coercion, promises or threats. Under these circumstances, the suppression court's finding that appellant made a knowing and intelligent waiver of his *Miranda* rights is supported by the record and thus, the court did not err in

denying appellant's motion to suppress the incriminating statement.

Appellant also contends that during argument to the jury at the sentencing hearing the prosecutor made several comments designed to inflame the passions of the jury, causing the jury to return a sentence of death based on arbitrary factors such as anger, fear, hatred and sympathy.

■ The first comment made to which appellant objects is as follows:

> How many people do you know who cannot read or write, yet are honest as the day is long and law-abiding?

> In fact, the Supreme Court of the United States ruled a number of years ago that the fact that a person cannot read or write should not bar that person from voting, because the court reasoned there are lots of people who can't read and write who are, nevertheless, intelligent, law-abiding, well-informed citizens. So how much of a part does that play in whether a person should be excused from criminal conduct?

Appellant argues that this comment was irrelevant and intruded upon the jury's objectivity. We do not agree. The comment was made in response to the testimony of Dr. Cooke, appellant's expert in psychology, who testified at the sentencing hearing that appellant's school records indicate that he always achieved no higher than an early first grade reading level, had a low verbal I.Q. and was placed in remedial classes in public school. This testimony was given in the context of Dr. Cooke's description of appellant's personality, his problems in coping with the world, his antisocial behavior and disregard for authority.[12] Thus, the prosecutor's comment was a legitimate, unimpassioned response to the evidence appellant presented in support of a mitigating circumstance.

**12.** These matters were relevant since among the mitigating circumstances enumerated in Section 9711(e) of the Sentencing Code is "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S. § 9711(e)(3).

■ Next, appellant contends that the prosecutor's comment that the jury may seek vengeance on behalf of society to defend itself against heinous crimes was improper and drew upon the jurors' emotion. The prosecutor argued:

Let me ask you something, ladies and gentlemen: Counsel says to you that you are not here for vengeance. Well, I say to you you are.

. . . .

He stands before you now, that cloak of innocence removed. He stands before you convicted as a deliberate, willful, premeditated killer, who acted with cruelty, hardness of heart and wickedness of disposition. You are here representing society. How much shall you turn the other cheek?

When you're alone in your bedroom some night, if someone comes into your bedroom with a gun or a knife, what shall you do?

Shall you ask him whether he had a deprived childhood?

Shall you ask him how far he went in school?

Shall you ask him if he has problems making friends? Do you turn the other cheek?

No. If you have a gun, you're going to pull that gun out and you're going to shoot him, because your primary objective there is to save yourself and your family from harm and your primary objective as you sit right there is to save society from any further harm by this individual.

Our society, for some years now, but particularly now, has been under attack. There are crimes that are so terrible that we've almost become jaded . . .

There are people all over the place committing terrible crimes and there's a million reasons attributed to them. Deprived childhood. Insanity. Political belief. When does it stop?

Society says, "O.K. It's all right to give people a certain amount of leeway to look at their actions and a certain amount of human compassion," but don't we reach a certain point where we say, "Our survival as a society is at stake. We simply have to put a stop to this.

We're not going to accept these explanations anymore. We're going to defend ourselves"?

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), we reviewed the propriety of a prosecutor's appeal to the jury to settle the score on behalf of society by imposing the death penalty. The prosecutor argued:

> "Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty."

*Id.,* 502 Pa. at 502, 467 A.2d at 302. We viewed these comments as pointing out the rationale and utility of a death penalty. We found these comments to have been no more than permissible "oratorical flair" in arguing in favor of imposing that penalty, which, by the terms of the statute, the prosecutor is permitted to do. 42 Pa.C.S. § 9711(a)(3).

In the instant case the prosecutor's statement to the jury that it is here for vengeance was made in rebuttal to defense counsel's urging that they were not[13]. The remainder of the statement focused on society's interest in deterrence. We recognized in *Travaglia* that the balance of principles which results in certain rules being appropriate at the "guilt phase" of a trial may be struck differently at a hearing to determine the appropriate penalty. *Id.,* 502 Pa. at 501–502, 467 A.2d at 302. While we have recognized that considerations of vengeance have no place during the guilt phase of a trial, during which the jury makes the factual determination as to guilt, the sentencing phase of a first degree murder trial in essence asks the jury to bring the values of society to bear in determining the appropriate sentence. To say that no part of the rationale for having a death penalty involves society's interest in retribution is to

---

**13.** In his closing argument, defense counsel stated to the jury, "as to guilt or innocence, you've rendered your decision ... We're not here for vengeance or revenge."

ignore the values held by our citizenry which influenced our General Assembly to enact such a law.

We have held that it is not improper or prejudicial for a prosecutor to remark concerning the "deterrent effect" of the death penalty. *Commonwealth v. Zettlemoyer, supra.* And in *Travaglia, supra,* we permitted a prosecutor's plea to even the score. The prosecutor's comments in the instant case were not a call to the jury to act in an arbitrary or capricious manner. They were requests to consider some of the objectives of the death penalty statute and were within the degree of "oratorical flair" permitted a prosecutor at a sentencing hearing.

■ Appellant also contends that the following series of comments by the prosecutor impermissibly inflamed the passions of the jurors:

Ladies and gentlemen, I was reading last night from a document that was published nearly three thousand years ago. It was the Greek epic The Iliad and there's a discussion about one of the generals. He was describing one of the many wars or battles described in The Iliad, his name was General Achilles, and he was described as follows:

"He has destroyed pity. Like a lion, he has gone among the flocks of men to devour them."

That is a portrait of someone without pity, without feeling, and that was a portrait of this defendant on the morning of October 10th, 1981. That portrait is three thousand years old. You say to yourselves, as intelligent, compassionate, sensitive people, there must be an explanation. There must be an excuse for this kind of sadistic, vicious conduct.

Well, I say to you, ladies and gentlemen, you may hear excuses offered for this kind of conduct, you may hear reasons given to you why this conduct should be minimized, but I say to you that you must acknowledge the presence in this world, ever since history has been recorded, of people who do evil, who are evil. They're different from other people. Why?

I don't know. Something is missing. They don't care about anything but the satisfaction of their immediate appetites. They don't come into your house and say, "Gee, do you have a wife?

"Do you have a husband?

"Do you have children?

"Are you ill?"

They don't do that. They stab you and take your money. They don't care. They are unfeeling. People like that have been with us and always will be. They're different from you and me. They are evil and evil is with us, still.

You can trace the concept through history. The Bible speaks of the Prince of Darkness. The personification of evil. All of our cultures, ancient and modern, primitive and civilized, have symbols for the presence of evil. The symbol abounds in our history and our literature. Shakespeare's Iago. The play Othello is the personification of evil. Adolph Hitler is the personification of evil. Six million people were killed. Did he have a low IQ?

There were people in Washington, D.C. about eight years ago. Someone went into a house and killed all the adults and drowned all the babies. There are people who you can hire to kill someone for money. . . .

There is evil among us. There are people who don't care for anybody or anything and I suggest to you, ladies and gentlemen, based on the evidence that you have heard, that this defendant is such a person.

. . . .

I do not suggest to you that the defendant is an animal. That would be insulting. Animals kill for food. They kill to protect their young. It is only certain types of human beings who kill to satisfy other pleasures, such as money or sex. That is a degree of barbarism which animals apparently, in their dumb states, have never managed.

Again, we find this to be responsive to the arguments of defense counsel and within the parameters of permissible argument in support of imposition of the death penalty.

The central theme of the evidence and argument made on behalf of appellant at the sentencing hearing was that appellant had mental deficiencie , which diminished his capacity to restrain his behavior. The prosecutor responded by arguing that appellant's lack of self-restraint was not due to his mental deficiencies, but rather, his actions were a manifestation of an evil disposition. Out of the ten aggravating circumstances listed in 42 Pa.C.S. § 9711(d), the prosecution argued for, and the jury found, the following three:

(6) The defendant committed a killing while in the perpetration of a felony

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense

(8) The offense was committed by means of torture.

These circumstances are "aggravating" because they are indicative of a greater degree of moral turpitude. The prosecutor was attempting to convince the jury that moral turpitude was the cause of appellant's transgressions and not an alleged incapacity to restrain his behavior. We find the theme of the prosecutor's argument to be a legitimate response to defense counsel's assertion of appellant's impaired capacity to restrain his behavior as a mitigating circumstance.

Appellant complains of the injection of certain notorious, evil figures into the prosecutor's argument. However, the prosecutor did not attempt to equate appellant's deeds with theirs. Rather he referred to them as examples of those whose horrible deeds were manifestations of evil and not the result of some exculpatory deficiency. The injection of such names as the Prince of Darkness and Adolph Hitler may tend to arouse the passions of the jurors, but considering the context in which the names were used, we do not find that those references were so inflammatory to have caused the jury's sentencing verdict to be the product of passion, prejudice or other arbitrary factor.

■ Appellant also contends that the prosecutor's calling attention to the victim, his wife, his family in Jordan and to Ms. Minor was an improper appeal for sympathy from the jury. The prosecutor stated:

... about eight thousand miles away from here, in a country called Jordan, there's a family that wonders what happened when they sent their son to the United States of America to further his education. There's a woman, named Mahin Murtaza, whose life was horribly shattered, who was a widow after six months and who witnessed a terrifying, terrifying thing. There's a young lady, named Juliana Minor, who, I'm sure, must wake up some nights and think of that night when this defendant leaped into her door with a knife. Shall you pity him, shall you have sympathy for him or shall you draw a line and say to him, "You have gone too far. You have stepped over all bounds of human decency. You have, by your acts, shown me that you are so depraved that you do not deserve my consideration"?

. . . .

The people who deserve your sympathy aren't here and one of them will never be here again. I ask you to draw that line. He stepped over it.

In *Travaglia*, we stated that prejudice might arise from reference to the victim if such reference has the effect of arousing the juror's emotions to such a degree that it becomes impossible for the jury to impose sentence based on consideration of the relevant evidence according to the standards of the death penalty statute. *Supra*, 502 Pa. at 502, 467 A.2d 302. In *Travaglia*, we noted that the memory of the deceased victims was first invoked by defense counsel who argued that there was no legitimate reason to kill the defendant because to do so would not bring back the victims. We held that the prosecutor's retort, asking the jury to show the defendant the same sympathy that he exhibited to his victims, was within the realm of correcting extraneous arguments introduced by the defense and was not prejudicial. Similarly, in the instant case, defense coun-

sel argued to the jury in his closing at the sentencing hearing that they were not here for revenge and that there was nothing anyone could do to bring back the decedent. The prosecutor's mention of the victims was responsive to defense counsel's argument, and was not so impassioned as to arouse the juror's emotions to the point at which they could no longer decide on the appropriate sentence based on consideration of the relevant evidence according to the standards of the statute. Therefore, the statements were not prejudicial.

 Finally, in cases in which a death sentence has been imposed we conduct a proportionality review to determine whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. 42 Pa.C.S. § 9711(h)(3)(iii); *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). In conducting this review, we are aided by a comprehensive study[14] conducted by the Administrative Office of Pennsylvania Courts (AOPC) of all cases resulting in a conviction for murder in the first degree from September 13, 1978 up to the present, the period of time for the relevant and effective sentencing procedures. This study includes the facts and circumstances of the crimes, the gender, race and age of the defendant and victim, the defendant's prior criminal record, if any, and data relating to the conduct and prosecution of each case.

After hearing the evidence presented at trial and at the sentencing hearing, the jury found the three following aggravating circumstances listed in Section 9711(d) of the Sentencing Code present:

**14.** This study is entitled "Pennsylvania Death Penalty Study," and it has been ordered by this Court in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). This study is an ongoing one and we have imposed a continuing obligation on the President Judge of every county to supply updated data to the Administrative Office of Pennsylvania Courts on each first degree murder conviction.

(6) The defendant committed a killing while in the perpetration of a felony.

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8) The offense was committed by means of torture. 42 Pa.C.S. § 9711(d)(6), (7), (8). Despite evidence presented and argument made by the defense to support the mitigating circumstance of substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, 42 Pa.C.S. § 9711(e)(3), the jury did not find this mitigating circumstance present. The jury did, however, find the presence of "other evidence of mitigation concerning the character and record of the defendant and the circumstances of the case." 42 Pa.C.S. § 9711(e)(8). The jury found that the aggravating circumstances outweighed the mitigating circumstances and, according to the court's instructions,[15] sentenced appellant to death.

We have carefully reviewed the information provided by AOPC and found that in the overwhelming majority of cases in which the jury has found that the defendant committed the killing in the perpetration of a felony, and created a grave risk of death to another person in addition to the victim, the jury has found that those aggravating circumstances outweigh what in most of those cases have been numerous mitigating circumstances, including those concerning the character and record of the defendant. In the few cases in which a jury has found a killing was

**15.** 42 Pa.C.S. § 9711(c)(1) provides:

(c) Instructions to jury.—
(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

. . . .

(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

committed while in the perpetration of a felony and was committed by means of torture, the jury has consistently sentenced the defendant to death. In this case the aggravating circumstance of killing during the perpetration of a felony was accompanied by both the defendant knowingly creating a grave risk of death to another and committing the murder by means of torture. In light of this information and our own independent evaluation of the entire record in this case, we conclude that the sentence of death imposed by the jury in the instant case was neither excessive nor disproportionate to penalties imposed in similar cases. Therefore, we sustain the conviction of murder in the first degree and affirm the sentence of death.[16]

LARSEN, J., joins this Opinion Announcing the Judgment of the Court and files a separate concurring opinion in which PAPADAKOS, J., joins.

PAPADAKOS, J., joins this Opinion Announcing the Judgment of the Court and files a separate concurring opinion.

HUTCHINSON, J., files a concurring opinion.

FLAHERTY, J., files a concurring and dissenting Opinion in which NIX, C.J., and ZAPPALA, J., join.

LARSEN, Justice, concurring.

I join the majority's opinion and affirmance of Raymond Whitney's convictions and judgments of sentence, including his well deserved sentence of death on the conviction for murder of the first degree.

Words are wholly inadequate to fully convey the terror that must have been felt by appellant's victims on October 10, 1981, or to describe the depravity of this murderer's mind as reflected in his deeds. In my opinion, the prosecu-

16. Because we have upheld the sentence of death imposed by the jury, we hereby direct the prothonotary of the Eastern District to transmit to the Governor, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court as required by 42 Pa.C.S. § 9711(i).

tor's dramatic attempts to convey those feelings to the jury in arguing in favor of the death penalty in this case amounted to fair commentary and legitimate argument under the Sentencing Code and our cases interpreting the Code.

Raymond Whitney deliberately, wilfully and with premeditated malice subjected his victims on October 10, 1981 to unfathomable horrors which were proven beyond a reasonable doubt at a fair trial, and he would now have this Court vacate his sentence of death because the prosecutor accurately, albeit dramatically, conveyed to the jury the stark terror of his actions. The prosecutor's closing comments were indeed "chilling", as appellant states, but how could they be otherwise? The actual events which led the jury to administer this society's ultimate punishment were far more "chilling" than anything the prosecutor could have said.

Our Sentencing Code specifically provides that counsel may "present argument for or against the sentence of death." 42 Pa.C.S.A. § 9711(a)(3). As the majority makes clear and, as the Sentencing Code suggests, "the 'sentencing phase' of the trial has a different purpose than the 'guilt phase' and different principles may be applicable. ... Likewise, the presumption of innocence which accompanies the accused throughout proceedings to determine his guilt has no direct application to the sentencing determination. ... We again observe that the balance of principles which results in certain rules being appropriate at the 'guilt phase' of a trial, may be struck differently at a hearing to determine appropriate penalty." *Commonwealth v. Travaglia*, 502 Pa. 474, 499, 501–02, 467 A.2d 288 (1983). Accordingly, we have permitted more oratorical license and impassioned argument during the sentencing stage of the proceedings for both prosecuting and defending counsel than is usually permitted at the guilt phase of the trial.[1] *See, e.g., Com-*

---

1. It is interesting to observe that defense counsel's closing argument contained references to matters not presented on the record. For example, counsel argued that perhaps in the future, medical science will find "cures" for appellant's mental and social "defects" and that this possibility should lead the jury to return a sentence of life imprisonment.

monwealth v. Travaglia, supra; Commonwealth v. Zettle-moyer, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) reh. denied, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983); Commonwealth v. Pursell, 508 Pa. 212, 495 A.2d 183 (1985).

In the instant case, I believe the prosecutor's dramatic closing comments, while inappropriate had they been uttered at the guilt phase of trial, were legitimate arguments to make at the sentencing hearing—in fact, his comments fit the crime "like a glove". Society *is* under attack by persons like Raymond Whitney. Evil *is* personified in such persons and in Raymond Whitney's deeds. Raymond Whitney *has* acted in a manner beneath the dignity of animals who kill only when necessary for survival. And regarding the prosecutor's analogies to various infamous real and fictional characters, I do not believe the prosecutor was attempting to place Raymond Whitney alongside these evil figures in history or notoriety. The prosecutor's references conveyed the extreme degree of maliciousness exhibited by Raymond Whitney on October 10, 1981, which maliciousness does constitute an attack on society. If one commits acts of evil, then that person will not be heard to complain when that evil is described—the very nature of the matter requires the use of evil terms.

Our standard of review in cases involving the death penalty is set by the Sentencing Code, 42 Pa.C.S.A. § 9711(h). In addition to our "authority to correct errors at trial," § 9711(h)(2), we are required to review the sentencing procedures and directed to "affirm the sentence of death *unless*" we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering

both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S.A. § 9711(h)(3).

Applying these standards to the instant case requires that we affirm the sentence of death. Raymond Whitney received a full and fair trial that afforded him all available procedural and substantive rights, and was convicted, inter alia, of murder of the first degree. That conviction led to imposition of a sentence of death, a sentence that is most certainly not excessive or disproportionate to that imposed in similar cases. Moreover, there was overwhelming evidence to prove to a virtual certainty that Raymond Whitney intentionally killed Mr. Taha while perpetrating a heinous felony (attempted rape), that he tortured Mr. Taha and his wife unmercifully, and that he callously placed Mr. Taha's wife at grave risk of death, thus proving three aggravating circumstances beyond any doubt. 42 Pa.C.S.A. § 9711(d) (6, 8 and 7, respectively).

In light of the overwhelming evidence of these three brutal and terrifying aggravating circumstances, it is clear that the sentence of death was not, as the dissenters suggest, "induced by the prosecutor's remarks," at 1156, but was, rather, *required by the evidence and the Sentencing Code.* The prosecutor's dramatic closing argument in favor of the death penalty, although impassioned and emotional, was nevertheless fair commentary tailored to this particular murderer's atrocious acts and crimes, and the sentence of death was not "the product of passion, prejudice or any other arbitrary factor." Mr. Whitney has proven himself to be a deserving recipient of society's fullest measure of punishment and his sentence of death must be affirmed under our standard of review established by the Sentencing Code.

The United States Supreme Court has recently reviewed a sentence of death imposed in a very similar case. In *Darden v. Wainwright,* — U.S. —, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), that Court affirmed the sentence of death imposed upon the petitioner who had murdered the

proprietor of a store while he was robbing it, sexually assaulted the dying man's wife and shot a neighbor who was attempting to help the store owner in the face. During his summation at the guilt-innocence stage of the proceedings, the prosecutor made numerous inflammatory comments, including that petitioner was a "vicious animal" who "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash," that the prosecutor wished someone had "blown his head off" and was "sitting here with no face, blown away by a shotgun," and imploring the jury to sentence petitioner to death as "the only way anybody can be sure of" keeping petitioner from getting "out on the public." —— U.S. at ——-——, notes 5–12, 106 S.Ct. at ——-——, notes 5–12. The United States Supreme Court affirmed both petitioner's convictions for murder, robbery and assault with intent to kill as well as his sentence of death, holding that while petitioner's trial was "not perfect . . . neither was it fundamentally unfair." —— U.S. at ——, 106 S.Ct. at ——. That Court held that the "relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Donnelly v. De-Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). . . . Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial." *Id.* This conclusion was based upon a complete review of the prosecutor's comments in the context of the evidence presented, defense counsels' remarks to the jury, the court's instructions to the jury, and the determination that the jury's verdict was based upon the overwhelming evidence and the law, not upon the prosecutor's inflammatory remarks. *Id.* So too in the instant case, the prosecutor's impassioned remarks at the sentencing hearing did not deny Raymond Whitney due process of law, nor do they require that we overturn the sentence of death under the Sentencing Code.

PAPADAKOS, J., joins in this concurring opinion.

PAPADAKOS, Justice, concurring

I join Mr. Justice McDermott's Opinion and Mr. Justice Larsen in affirming the Appellant's convictions and sentence of death imposed on Raymond Whitney. I write separately because I am distressed by the suggestion of the dissent that the prosecutor's closing statement may have compelled a sentence of death based on passion, prejudice or any other arbitrary factor. For this Court to reverse a sentence of death, it must determine that "the sentence of death was the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. §§ 9711(h)(3)(i). This requirement exists in light of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which imposed on the States the responsibility of drafting sentencing codes which would guide and channel the sentencing authority's discretion by resorting to the examination of specific factors that argue in favor of or against the imposition of the death penalty. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). Total arbitrariness and capriciousness is thus eliminated in the imposition of a sentence of death.

The evidence of record compels the jury's findings of aggravating circumstances 6, 7, and 8 (42 Pa.C.S. §§ 9711(d)(6, 7, 8)[1]). These circumstances sufficiently outweigh the mitigating circumstance found by the jury, 42 Pa.C.S. § 9711(e)(8), "Any other evidence concerning the character of the defendant and the circumstances of his offense." Since the jury found that the three aggravating circumstances outweighed the mitigating circumstance, they were required to return a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv). For a review of the facts considered by the jury, I need only refer to Mr. Justice McDer-

---

[1]. 42 Pa.C.S. §§ 9711(d) provides in pertinent part:
 Aggravating circumstances shall be limited to the following:
 (6) The defendant committed a killing while in the perpetration of a felony.
 (7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.
 (8) The offense was committed by means of torture.

mott's recitation of the gruesome facts as set forth in the Majority Opinion.

The District Attorney's comments do not constitute reversible error unless "the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Pursell, supra; Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730 (1984); *Commonwealth v. Tabron,* 502 Pa. 154, 465 A.2d 637 (1983); *Commonwealth v. Anderson,* 501 Pa. 275, 461 A.2d 208 (1983). Viewed in this context, the comments must so prejudice the jury as to interfere with its rendering of a true sentence, thereby forcing its issuance of a totally arbitrary or capricious imposition of death, forbidden by *Furman.*

The intensity of the closing remarks of the District Attorney to the jury was not so overbearing, overshadowing or convincingly argued as to hypnotize, inflame or impassion the jury against Appellant and disable the jury from rendering a true verdict. This jury was not a glob of dough that was kneaded into submission by the oratorical display of the prosecuting attorney. This jury returned a verdict of death because the Appellant had killed an innocent human being by means of torture, and because Appellant, while committing a felony, had killed a human being, and because Appellant had knowingly created a grave risk of death to another while committing the offense.

Why are the dissenters so sensitive to dramatic oratory, yet insensitive to the heavy weight of the clear evidence which supports the conclusion of the jury? Why do they ascribe more weight to the words of expressive comparisons than they do to the plunging of the dagger twenty-eight times into his victim, while a horrified wife looked on, than they do to the attempted ravaging of the wife, than they do to the Appellant's stabbing and cutting of the wife? How can the Dissenters believe that any oratorical flair of the prosecutor could possibly intensify in the minds of the jury the horrors of the deeds committed by Appellant?

Given the outrageousness of Appellant's conduct towards his victims, it was only natural for the prosecutor to argue as forcefully as possible in favor of a death sentence, and while he did so expressively, his arguments were within acceptable bounds of advocacy during the sentencing phase. *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983). The argument of the District Attorney could not deceive the jury into returning a totally arbitrary death sentence. Clearly, this jury's decision was influenced by facts and not by argument of counsel. *CF, Darden v. Wainwright,* —— U.S. ——, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

HUTCHINSON, Justice, concurring.

I join the Court's affirmance of appellant's conviction and the sentence of death imposed by the jury.

However, I also believe that the comments made by the prosecutor in his closing statement were both intemperate and improper. They appear to be an inappropriate effort to point out to the jury that human acts are not determined by impersonal factors, but that we have the capacity to do evil of our own free will and that an individual who chooses to do evil should be punished according to the degree of his evil.

On the facts of this case, however, I do not believe these remarks justify our overturning the death penalty. Our death penalty act directs us to affirm a death sentence imposed by a jury unless it is the product of passion, prejudice or some other arbitrary factor. 42 Pa.C.S. § 9711(h). A jury is under a duty to act based on the facts, not the arguments of counsel. We should not presume that juries are so unsophisticated that they will abandon this duty when exposed to an overzealous prosecutor's argument. The heinous facts in this case, which are fully recited in the majority opinion, are more than adequate to warrant the death penalty. Against the background of these facts, I believe the prosecutor's comments were harmless error. The verdicts arose from and are justified by the

facts, not any passion or prejudice generated by the prosecutor's ill-advised and unnecessary comments.

Prosecutors with strong cases would be well advised, however, to let the facts speak for themselves. Juries can be trusted to appreciate them.

FLAHERTY, Justice, concurring and dissenting.

I join in that portion of the majority's opinion affirming appellant's conviction for murder of the first degree, but dissent with respect to the majority's affirmance of the sentence of death.

During the sentencing hearing, the prosecution made numerous arguments to the jury that constituted improper appeals to the passions and sympathies of the jurors. It is established that, at the sentencing hearing in a first degree murder case, "the Commonwealth, just as the defense counsel, must have reasonable latitude in arguing his position to the jury." *Commonwealth v. Zettlemoyer*, 500 Pa. at 55, 454 A.2d at 958. See also *Commonwealth v. Travaglia*, 502 Pa. 474, 498–503, 467 A.2d 288, 300–302 (1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). Indeed, the Sentencing Code itself provides that after "the presentation of evidence, the court shall permit counsel to present argument for and against the sentence of death." 42 Pa.C.S.A. § 9711(a)(3). Nevertheless, the prosecutor is not permitted to arouse the emotions of the jury "to such a degree that it becomes impossible for the jury to impose sentence based on consideration of the relevant evidence according to the standards of the statute." *Commonwealth v. Travaglia*, 502 Pa. at 502, 467 A.2d at 302.

In *Commonwealth v. Zettlemoyer*, 500 Pa. at 53–54, 454 A.2d at 956–957, this Court set forth guidelines governing the review of claims of allegedly improper and prejudicial remarks made by prosecutors during arguments at sentencing hearings, and, quoting *Commonwealth v. Brown*, 489 Pa. 285, 297–298, 414 A.2d 70, 76 (1980), the guidelines were set forth:

The primary guideline in assessing a claim of error of this nature is to determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. *Commonwealth v. McNeal*, 456 Pa. 394, 319 A.2d 669 (1974); *Commonwealth v. Van Cliff*, 483 Pa. 576, 397 A.2d 1173 (1979). In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, Code of Professional Responsibility, Canon 7, E.C. 7-19—7-39, and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Cronin*, 464 Pa. 138, 346 A.2d 59 (1975). Nevertheless, we do require that the contentions advanced must be confined to the evidence and the legitimate inferences to be drawn therefrom. *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972). Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). The verdict must flow from the respective strengths and weaknesses of the evidence presented and not represent a response to inflammatory pleas for either leniency or vengeance. *Commonwealth v. Starks*, 479 Pa. 51, 387 A.2d 829 (1978).

See also *Commonwealth v. Pursell*, 508 Pa. 212, 226-227, 495 A.2d 183, 190-191 (1985).

Applying these guidelines to the instant case, it is clear that the bounds of reasonable latitude were exceeded by the arguments of the prosecutor. As the following excerpts from those arguments demonstrate, the prosecutor violated all of the applicable standards.

Let me ask you something, ladies and gentlemen: *[Defense counsel] says to you that you are not here for vengeance. Well, I say to you you are.*

... He stands before you convicted as a deliberate, willful, premeditated killer, who acted with cruelty, hardness of heart and wickedness of disposition. *You are here representing society. How much shall you turn the other cheek?*

When you're alone in your bedroom some night, if someone comes into your bedroom with a gun or a knife, what shall you do?

Shall you ask him whether he had a deprived childhood?

Shall you ask him how far he went in school?

Shall you ask him if he has problems making friends?

*Do you turn the other cheek?*

No. If you have a gun, you're going to pull that gun out and you're going to shoot him, because your primary objective there is to save yourself and your family from harm and your primary objective as you sit right there is to save society from any further harm by this individual.

Our society, for some years now, but particularly now, has been under attack. There are crimes that are so terrible that we've almost become jaded....

There are people all over the place committing terrible crimes and there's a million reasons attributed to them. Deprived childhood. Insanity. Political belief. When does it stop?

Society says, "O.K. It's all right to give people a certain amount of leeway to look at their actions and a certain amount of human compassion," but don't we reach a certain point where we say, *"Our survival as a society is at stake.* We simply have to put a stop to this. We're not going to accept these explanations anymore. *We're going to defend ourselves?"*

. . . .

Ladies and gentlemen, I was reading last night from a document that was published nearly three thousand years ago. It was the Greek epic The Iliad and there's a discussion about one of the generals. He was describing one of the many wars or battles described in The Iliad, his

name was *General Achilles,* and he was described as follows:

"He has destroyed pity. Like a lion, he has gone among the flocks of men to devour them."

That is a portrait of someone without pity, without feeling, and *that was a portrait of this defendant* on the morning [of the murder]. That portrait is three thousand years old. You say to yourselves, as intelligent, compassionate, sensitive people, there must be an explanation. There must be an excuse for this kind of sadistic, vicious conduct.

... [B]ut I say to you that you must acknowledge the presence in this world, ever since history has been recorded, of people who do evil, who are evil.

. . . .

You can trace that concept through history. The Bible speaks of the *Prince of Darkness.* The personification of evil. All of our cultures, ancient and modern, primitive and civilized, have symbols for the presence of evil. The symbol abounds in our history and our literature. Shakespeare's *Iago.* The play Othello is the personification of evil. *Adolf Hitler* is the personification of evil. Six million people were killed....

There were people in Washington, D.C. about eight years ago. *Someone went into a house and killed all the adults and drowned all the babies.* There are *people who you can hire to kill someone for money.*

. . . .

There is evil among us. There are people who don't care for anybody or anything and I suggest to you, ladies and gentlemen, based on the evidence that you have heard, that this *defendant is such a person.*

. . . .

I do not suggest to you that the defendant is an animal. That would be insulting. Animals kill for food. They kill to protect their young. It is only certain types of human beings who kill to satisfy other pleasures, such as money

or sex. That is a degree of barbarism which animals apparently, in their dumb states, have never managed.

. . . .

... His acts were intentional. He does not deserve your sympathy in any way, ladies and gentlemen.

The *people who deserve your sympathy aren't here and one of them will never be here again.*

(Emphasis added). By these remarks, the prosecutor attempted to incite the jury with a fixed bias and hostility towards the accused, advanced contentions that were not confined to the evidence and the legitimate inferences to be drawn therefrom, endeavored to cause the verdict to be a product of the emotion rather than reflective judgment, and invoked a plea for vengeance and sympathy designed to make the verdict flow from other than the respective strengths and weaknesses of the evidence.

Indeed, in addition to the prosecutor's *express* requests for vengeance and sympathy, and other comments contributing to an inflammatory tone, such as those stating that society is under attack and that the jurors need to respond to that attack, the foregoing excerpts contain attempts to incite the jurors to equate appellant with some of the most vicious and heinous persons in the literature and history of mankind: Achilles, a vengeful and merciless military leader who ravaged the countryside near the legendary city of Troy; The Prince of Darkness, otherwise known as the devil; Iago, an inherently evil and malicious individual with no redeeming features, portrayed in Shakespeare's Othello; and Adolf Hitler, the infamous, demented, racist, practitioner of genocide. The prosecutor even likened appellant to a mass murderer of babies, and to a hired killer. None of these analogies bears a significant relationship to the evidence presented in the instant case, and, clearly, each was intended to inflame the passions of the jurors. Indeed, it would be difficult to conceive of comparisons that would be more inflammatory than those which the prosecutor employed. Under these circumstances, one must conclude that the verdict of death may have been induced by the prosecu-

tor's remarks, and, thus, the sentence of death should be vacated and the case should be remanded to the Court of Common Pleas for imposition of a sentence of life imprisonment.

NIX, C.J., and ZAPPALA, J., joins in this concurring and dissenting opinion.