J-A05006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| WADE M. POLITES, ADMINISTRATOR OF THE ESTATE OF TIMOTHY J. POLITES | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID CONTORCHICK | : | No. 1104 WDA 2016 |
| Appellant | | |

Appeal from the Judgment June 29, 2016
In the Court of Common Pleas of Cambria County
Civil Division at No(s):  No. 2009-3148

BEFORE:   GANTMAN, P.J., BENDER, P.J.E., and MOULTON, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED MARCH 14, 2017**

Appellant, David Contorchick, appeals from the judgment entered in the Cambria County Court of Common Pleas, in favor of Timothy J. Polites, now deceased,[1] in the amount of $48,635.20, following a bench trial in this action for breach of a partnership agreement, conversion, and unjust enrichment.  We affirm.

In its opinions, the trial court correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add only the following fact: the parties agreed to use December

---

[1] By order of this Court, on January 25, 2017, we granted the motion to substitute Wade M. Polites, Administrator of the Estate of Timothy J. Polites, as Appellee.

31, 2006 as the date of the partnership dissolution, with the winding up of operations occurring in 2007. Procedurally, Appellant timely filed his notice of appeal on July 27, 2016. On August 1, 2016, the trial court ordered Appellant to file a Rule 1925(b) statement, which Appellant timely filed on August 17, 2016.

Appellant raises three issues for our review:

> WHETHER THE TRIAL COURT ERRED BY ALLOWING APPELLEE'S ASSET VALUATIONS INTO EVIDENCE WHEN THE OUT OF COURT STATEMENTS WERE NOT SUPPORTED OR ANALYZED BY QUALIFIED VALUATION EXPERT?
>
> WHETHER THE TRIAL COURT'S VALUATION METHOD OF ASSETS WAS MADE IN ERROR AND IN CONTRAVENTION OF THE PARTIES' PARTNERSHIP AGREEMENT?
>
> WHETHER THE [TRIAL] COURT COMMITTED SPECIFIC ACCOUNTING ERRORS IN ITS DECISION?

(Appellant's Brief at 4).

Preliminarily, we observe that appellate briefs must conform in all material respects to the briefing requirements set forth in the Pennsylvania Rules of Appellate Procedure. *Rosselli v. Rosselli*, 750 A.2d 355 (Pa.Super. 2000), *appeal denied*, 564 Pa. 696, 764 A.2d 50 (2000) (citing Pa.R.A.P. 2101). *See also* Pa.R.A.P. 2114-2119 (addressing specific requirements of each subsection of brief on appeal). Regarding the argument section of an appellate brief, Rule 2119(a) provides:

> **Rule 2119.  Argument**
>
> **(a) General rule.**  The argument shall be divided into as many parts as there are questions to be argued; and shall

have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a). Importantly:

The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities. This Court will not consider the merits of an argument which fails to cite relevant case or statutory authority. Failure to cite relevant legal authority constitutes waiver of the claim on appeal.

*In re Estate of Whitley*, 50 A.3d 203, 209 (Pa.Super. 2012), *appeal denied*, 620 Pa. 724, 69 A.3d 603 (2013) (internal citations and quotation marks omitted). *See also Lackner v. Glosser*, 892 A.2d 21 (Pa.Super. 2006) (explaining appellant's arguments must adhere to rules of appellate procedure, and arguments which are not appropriately developed are waived on appeal; arguments not appropriately developed include those where party has failed to cite any authority in support of contention); *Estate of Haiko v. McGinley*, 799 A.2d 155 (Pa.Super. 2002) (stating rules of appellate procedure make clear appellant must support each question raised by discussion and analysis of pertinent authority; absent reasoned discussion of law in appellate brief, this Court's ability to provide appellate review is hampered, necessitating waiver of issue on appeal).

Instantly, Appellant failed to cite relevant legal authority to support any issue he raises on appeal. In addition, Appellant's third argument merely lists six alleged accounting errors in bullet point fashion, two of which

are duplicative, but Appellant does not explain how the court erred in these regards. Appellant's failure to develop any of his claims on appeal precludes meaningful review and constitutes waiver of all issues on appeal. *See* Pa.R.A.P. 2119(a); Pa.R.A.P. 2101; *Estate of Whitley, supra*.

Moreover, even if Appellant had properly preserved his issues on appeal, his claims would merit no relief, and we would affirm based on the trial court opinion. (*See* Trial Court Opinion, filed September 22, 2016, at 4-26) (finding: expert testimony was necessary for analysis of partnership financial records and certain aspects of asset valuation; Appellee's expert is licensed CPA and practicing since 1964; Appellee's expert was properly qualified to ascertain value of partnership assets as he has reasonable pretension to specialized knowledge of accounting and financial reports; Appellee's expert could rely on values Appellee provided regarding partnership tools/small equipment and heavy machinery because Appellee was partner and partnership's bookkeeper, so he had personal knowledge of cost of partnership assets and their relative worth; both parties offered proposed values to their respective experts; court did not accept either valuation as definitive, and instead averaged parties' proposed values to reach fair market value of tools/small equipment; regarding heavy machinery, Appellee was unable to have equipment appraised in 2007 because Appellant physically possessed machinery; Appellee testified that he used average value of actual sales of similar machinery sold on

MachineryTrader.com to establish values; Appellee's expert testified Appellee's valuation method was reasonable similar to method expert employed using TopBid.com; Appellant's equipment appraiser testified that he also used MachineryTrader.com to obtain his values for heavy equipment, but he used wholesale values rather than actual sales data; Appellant's expert further testified that lay person could use MachineryTrader.com to obtain values for heavy equipment, but would lack his expertise in appraising equipment; in sum, Appellant's expert testimony established that source Appellee used was proper and lay person could read and interpret data; only dispute was application of fair market value versus wholesale value; Appellant violated fiduciary duty; he wrongfully dissolved partnership by transferring all partnership assets to his new enterprise, while avoiding payment to Appellee of his share due under partnership agreement and relevant law; plain language of partnership agreement, logic, and law of Commonwealth do not support Appellant's interpretation of agreement; court does not have to accept fire-sale or wholesale value of assets where higher value is available; Appellant's proposed asset values were below average sales price and gave Appellant windfall; Appellant's asset values also lacked credibility as he provided lowest possible valuation to reduce his liability to Appellee; Appellee testified that parties agreed partnership would pay Appellant's life insurance premiums in exchange for Ace making matching Simplified Employee Pension ("SEP") contributions for Appellee;

partnership paid Appellant's life insurance premiums from 1994 to 2006, but made no matching payments to Appellee's SEP account; court found Appellee's testimony credible, and rejected Appellant's statements to contrary as incredible; court awarded Appellee credit equal to payments partnership made for Appellant's insurance premiums; court also found Appellee's testimony regarding intercompany debt more credible than Appellant's testimony; regarding court's decision to vacate its order imposing costs against Appellee because he failed to submit his expert report until five days before original trial date, hearing testimony showed Appellee's late filing was not dilatory, obdurate or vexatious, and amount sought for costs and fees was excessive under circumstances; additionally, court did not specify a date for Appellee's new expert report, so it would be improper to penalize him for filing expert's report "late" where there was no deadline to file it; no statute permits award of attorney's fees and costs under these circumstances).  Accordingly, we affirm.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/14/2017

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
**CIVIL DIVISION**

| | | |
|---|---|---|
| TIMOTHY J. POLITES, | * | |
| | * | |
| Plaintiff, | * | No. 2009-3148 |
| | * | |
| vs. | * | |
| | * | Findings of Fact, Conclusions of Law |
| DAVID CONTORCHIK, | * | and Decision |
| | * | |
| Defendant. | * | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Krumenacker, P.J.:** Timothy J. Polites (Polites) initiated this action against David

Contorchik (Contorchik) alleging that Contorchik breached their partnership agreement and

dissolved their partnership, Ace Excavating, in contravention of the partnership agreement. A

nonjury trial held August 10-11, 2015, and the parties were directed to file proposed findings

of fact and conclusions of law once the transcripts were prepared. Contorchik filed his

proposal on November 23, 2015 with Polites filing his on November 25, 2015. Upon careful

and thorough review of the evidence presented, the filed proposals and the laws of this

Commonwealth the Court makes the following Findings of Fact and Conclusions of Law:

1. The parties entered into a partnership agreement (Agreement) March 26, 1993, for the

   purpose of operating a business in the name of Ace Excavating (Ace). N.T. 8/10/15

   Vol. 1; Pl.'s Ex. 1.

2. Pursuant to the Agreement the parties were 50/50 partners in Ace, were to share

   equally in any profits or losses and were equal owners of all partnership assets. Pl.'s

   Ex. 1.

2016 APR 11 PM 2:59 PROTHONOTARY CAMBRIA COUNTY PA FILED FOR RECORD

61

3. The Agreement provides that neither partner may sell, assign, transfer, encumber, or otherwise dispose of any partnership property without the consent of the other partner and that any such action would be void. Pl.'s Ex. 1 Art. IV.

4. In early 2007 Polites became aware that Contorchik had informed others that Ace was no longer in business and that Contorchik was using Ace assets to conduct business under the name Contorchik Excavating. N.T. 8/10/15 Vol. 1 pp. 17, 20; Pl.'s Exs. 2, 3.

5. After learning this Polites informed Contorchik by letter that Ace assets were only to be used on Ace jobs. N.T. 8/10/15 Vol. 1 p. 20; Pl.'s Ex. 3.

6. Contorchik Excavating is operated from the same location that formerly housed Ace. Pl.'s Exs. 7, 8. N.T. 8/10/15 Vol. 1 pp. 25-26.

7. Contorchik admits that in 2007 he began operating Contorchik Excavating using the partnership assets and that he transferred title to various vehicles and equipment from Ace to Contorchik Excavating without Polites' consent. N.T. 8/10/15 Vol. 2 pp. 101-04.

8. Evidence establishes that the following equipment was owned by Ace and transferred to Contorchik Excavating:

   a. 1998 Ford Sterling LT9522 Triaxle;

   b. 1990 Ford Diesel Dump Tandem;

   c. 1998 John Deere 120 Trackhoe;

   d. 1997 John Deere 310 E Backhoe;

   e. 2003 Interstate Trailer;

   f. 1998 John Deere 550G Dozer;

   g. 1990 John Deere Skidsteer; and

h. 2005 Chevrolet Silverado.

N.T. 8/10/15 Vol 1. pp. 25-28; Vol. 2. pp.101-04; Pl.'s Exs. 9, 10, 11; Contorchik Depo. Pp. 47-61.

9. Contorchik continued to operate Ace to finish jobs already underway, made payments on Ace debt during 2007, and filed 2007 income tax returns for Ace. N.T. 8/10/15 Vol. 2 pp. 81, 99-100, 104; Pl.'s Ex. 33.

10. The parties agreed to use December 31, 2006, as the date of dissolution with the winding up of operations occurring in 2007. N.T. 8/10/15 Vol. 1 p. 83, Vol. 2 pp. 79, 81.

11. Section 8351 of the Partnership Act provides that dissolution of a partnership occurs when there is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on of the business. 15 Pa. C.S. § 8351.

12. Dissolution of a partnership does not equate with the termination of the partnership, which continues until the winding up of the partnership's affairs is completed. 15 Pa. C.S. § 8352.

13. Dissolution of a partnership in contravention of the terms of the partnership agreement constitutes a wrongful dissolution. 15 Pa. C.S.§ 8360(b).

14. The Court finds that Contorchik's unilateral transfer of Ace assets to his new business violated Article IV of the Agreement and that his actions constitute a wrongful dissolution of the partnership in contravention of the Agreement as he failed to comply with the requirement for termination contained in Article V of the Agreement. 15 Pa. C.S.§ 8360(b).

15. Section 8360 in pertinent part provides

(a) General rule.--When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing to the respective partners.
...

**(b) Dissolution in contravention of agreement.**--When dissolution is caused in contravention of the partnership agreement, the rights of the partners shall be as follows:

(1) Each partner who has not caused dissolution wrongfully shall have:
   (i) All the rights specified in subsection (a).
   (ii) The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

...

(3) A partner who has caused the dissolution wrongfully shall have:
   (i) If the business is not continued under the provisions of paragraph (2), all the rights of a partner under subsection (a) subject to paragraph (1)(ii).

...

15 Pa. C.S. § 8360.

16. The rules for settling the account between partners after dissolution are found in section 8362 that provides, in part, that partnership assets shall be used to satisfy partnership liabilities prior to distribution to the partners. 15 Pa. C.S. § 8362.

17. Section 8362 further provides that the partners shall contribute as provided by section 8331 (1) the amount necessary to satisfy liabilities. 15 Pa. C.S. § 8362(4).

18. Section 8331 in pertinent part reads

The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(1) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property, and share equally in the

profits and surplus remaining after all liabilities, including those to partners, are satisfied and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership, according to his share in the profits.

15 Pa.C.S. § 8331.

19. At the time of dissolution Ace assets consisted of the following categories:

    a.  Cash;

    b.  Tool and small equipment (Tools);

    c.  Real estate;

    d.  Heavy equipment.

20. Cash on hand totaled $1,461.

21. Polites testified that the value of the Tools was $24,025, N.T. 8/10/15 Vol. 1 p. 30; Pl.'s Ex. 12, while Contorchik's liquidation valuation expert, Heather Baranowski (Baranowski), testified that the value was $15,659. N.T. 8/10/15 Vol. 3 p. 88.

22. The Court finds the value of the Tools to be $19,842 this being the average of the two valuations as neither valuation was supported by an independent appraisal.

23. The partnership acquired at a tax sale an undeveloped lot in Bakerton valued at $3,500. N.T. 8/10/15 Vol. 1 pp. 32-33.

24. Contorchik asserts that this lot is now worth $2,000. N.T. 8/10/15 Vol. 3 p. 84.

25. The Court finds no evidence of record via an appraisal to support this reduced value and places the value of the lot at $3,500.

26. Ace conducted business out of a property located in Barr Township, however, though there was testimony this property was acquired by the partnership no deed was admitted into evidence and so the Court concludes it was not a partnership asset. N.T. 8/10/15 Vol. 1 p. 103.

27. The partnership owned a 2003 Interstate Model 40 DLA Lowboy. N.T. 8/10/15 Vol. 1 p. 35, Vol. 2 p. 103. Polites places the value of the Lowboy at $14,000, Pl.'s Ex. 12, while Contorchik values it at $ 7,400. Def.'s Ex. NN.

28. The lowboy was wrecked in 2008 with insurance proceeds totaling a net $10,482.98 after a $1,000 deductible. N.T. 8/10/15 Vol. 2 p. 103.

29. The Court finds the value of the Lowboy to be the insurance value of $11,482.98.

30. The parties offered the following valuation of the remaining Heavy Equipment:

| Asset | Polites value | Contorchik value |
| --- | --- | --- |
| 1998 Ford Sterling LT9522 Triaxle | $38,594 | $36,362 |
| 1990 Ford Diesel Dump Tandem | $11,995 | $ 7,208 |
| 1998 John Deere 120 Trackhoe | $28,430 | $37,500 |
| 1997 John Deere 310 E Backhoe | $22,900 | $19,000 |
| 1998 John Deere 550G Dozer | $35,275 | $28,000 |
| 1990 John Deere Skidsteer | $ 8,993 | $ 6,500 |
| 2005 Chevrolet Silverado | $18,000 | $16,432 |
| **TOTAL** | **$164,187** | **$151,002** |

31. Polites testified that he obtained his values using the average of actual sales on the Machinery Trader website. N.T. 8/10/15 Vol. 1 pp. 39-40.

32. Plaintiff's expert Don Kirsch (Kirsch) testified as a certified public accountant that the valuation method used by Polites was a reasonable method of obtaining fair market value. N.T. 8/10/15 Vol. 2 p. 35.

33. Kirsch testified that he employed a similar method using the website Top Bid to obtain the average of actual sale prices to establish a total vehicle and heavy

equipment value of $178,186 in his Liquidation Value Report. N.T. 8/10/15 Vol. 2. p. 16; Pl.'s Ex. 57, Schedules I and II.

34. Kirsch's total included a value of $14,000 for the Lowboy that must be removed to obtain a final total value of $164,187.

35. Baranowski testified that she applied forensic accounting to determine the partnership liquidation value but admitted that she relied solely on the values provided by Contorchik or Robert Walls (Walls) to determine the value of the heavy equipment. N.T. 8/11/15 Vol. 3 pp. 35, 82-83.

36. Walls testified that he is an expert appraiser, that the values he provided were based on information from the Machinery Trader website, and that they were wholesale rather than retail values. N.T. 8/10/15 pp. 60-63.

37. The Court finds the actual average sale values provided by Polites to more accurately reflect the value of these assets since had the partnership been dissolved under normal procedures the parties would have sought to maximize the return on each item by selling it for the retail rather than wholesale value provided by Walls.

38. Accordingly, the Court finds the value of the Heavy Equipment to be $164,187.

39. The Court finds that as of December 31, 2006, the partnership assets were as follows:

| Asset | Value |
|---|---|
| Cash | $ 1,461.00 |
| Tools and Small Equipment | $ 19,842.00 |
| Bakerton lot | $ 3,500.00 |
| Lowboy | $ 11,482.98 |
| Remaining heavy equipment | $ 164,187.00 |
| **TOTAL ASSETS** | **$ 200,472.98** |

40. Partnership liabilities as of December 31, 2006, were $129,099.00.

41. During 2007 payments were made totaling $28,178.49 by Contorchik on partnership liabilities during the winding up of Ace's business. N.T. 8/10/15 Vol. 1 pp. 47-51; Pl.'s Ex. 33.

42. Contorchik presented no evidence showing these payments did not occur or that the source of funds was from a source other than Ace.

43. The Court finds that the total liabilities as of the termination of the partnership in 2007 are $129,099.00 - $28,178.49 = $100,920.51.

44. Ace's net liquidation value is $200,472.98 - $100,920.51 = $99,552.47, with each partner's share is $49,776.24.

45. Polites makes claims for additional adjustments to the liqudation value as follows:

    a. Intercompany transfers owed to Polites other business LBW Builders (LBW) totaling $29,711.92;

    b. Matching SEP contributions of $7,722.00 due to an agreement between the partners that Ace would pay life insurance premiums for Contorchik and make matching SEP contributions for Polites; and

    c. Repayment of Ace funds used by Contorchik for personal expenses totaling $109,966.00.

46. As to the intercompany transfers testimony established:

    a. An ongoing relationship between Ace and LBW, as well as LBW's predecessor, existed from 1994 through 2006;

    b. From 1994 until 2000 Ace ran its payroll through LBW;

    c. Beginning in 2000 LBW began running its payroll through Ace;

    d. Ace would occasionally make purchases on LBW accounts.

47. Contorchik offered no evidence to contradict this evidence.

48. Accordingly, the intercompany payment owed by Ace to LBW constitutes a liability of Ace in the amount of $ 29,711.92. Pl.'s Ex. 57.

49. Polites is entitled to a credit of $ 14,855.96 representing 50% of this amount payable by Contorchik under section 8331 15 Pa. C.S. § 8331; Id.

50. As to the claim for SEP contributions:

   a. Polites testified that the parties agreed that Ace would make life insurance payments for Contorchik and in lieu of a similar policy for Polites, Ace would make matching contributions to Polites SEP account; N.T. 8/10/15 Vol. 1 pp. 53-54, 106-08.

   b. Polites testified that Ace made payments on a policy for Contorchik totaling $ 7,722.00 over the years 1994-2006. Id.; Pl.'s Exs. 35, 57.

   c. Polites testified that no matching payments were made. N.T. 8/10/15 Vol. 1 pp. 53-54, 106-08.

   d. Contorchik testified that while the parties did discuss life insurance premiums for him there was no agreement to make matching SEP contributions for Polites. N.T. 8/11/15 Vol. 2 pp. 84-85.

51. The Court finds Polites testimony in this regard credible as it is unlikely one party to an agreement will provide a benefit to the other without some form of *quid pro quo*.

52. Accordingly, Polites is entitled to a credit of $ 3,861.00 representing 50% of the $ 7,722 in life insurance premiums paid by Ace under section 8311. 15 Pa. C.S. § 8331; Pl.'s Ex. 57.

53. As to the claim for repayment of partnership funds used by Contorchik for personal expenses:

    a. Polites testified that he reviewed Ace business records including invoices, cancelled checks, and the Ace account registers and determined that Contorchik has used $ 109,966 of Ace funds for personal expenses. N.T. 8/11/15 Vol. 1 pp. 57-60; Pl.'s Exs. 36, 38, 39.

    b. Contorchik testified that while he did make some personal purchases out of Ace funds he repaid those amounts and that the sum claimed by Polites was for purchases made for Ace. N.T. 8/11/15 Vol. 2 pp. 108-15.

54. Upon review of the evidence presented the Court finds that Polites presented insufficient evidence on this claim. The evidence of record consists of register entries and cancelled checks made payable to various business entities that Ace conducted business with. There is no evidence to establish that these payments related to personal purchases of Contorchik rather than being purchases for Ace, other than Polites' bare testimony.

55. Accordingly, Polites is not entitled to a credit for any of the claimed Contorchik personal expenses.

56. Polites is thus entitled to an additional credit due of $ 14,855.96 + $ 3,861 = $ 18,716.96.

57. Finally, Polites asserts a claim for interest on the partnership assets.

58. It is well settled that "[t]he general rule is that interest will not be allowed on partnership accounts until there has been a settlement of the same. It is true … that the allowance or refusal of interest in the settlement of partnership accounts depends

upon the circumstances of each particular case." Greenan v. Ernst, 408 Pa. 495, 512, 184 A.2d 570, 579 (1962).

59. Here while this litigation has been lengthy there is nothing to suggest that Contorchik drew the matter out unnecessarily and it appears that both parties bear some responsibility for the length of the litigation. As such the Court will follow the general rule and not award interest as the circumstances are not such that it is warranted.

60. Accordingly the total due to Polites from following the winding up and liquidation of Ace is $ 49,776.24 + $ 18,716.96 = $ 68,493.20.

61. Contorchik argues that he is entitled to the following credits:

   a. Economic benefit for jobs conducted by Polites under the Ace name in the amount of $ 37,095.54;

   b. Credit for original capital contributions totaling $12,500.00 representing the value of a 1979 310 A backhoe and pickup truck Contorchik contributed to Ace when the partnership was formed;

   c. A capital account equalization payment of $ 7,358.00 representing the difference between the parties' capital accounts.

62. As to the claim for economic benefit:

   a. Polites' testified that the jobs in question were "pass through" jobs bid under the Ace name with all expenses paid for and work performed by LBW using no Ace assets or personnel. N.T. 8/10/15 Vol. 1 pp. 67-82; Pl.'s Exs. 50-55.

   b. Contorchik testified that he objected to the two jobs being bid under the Ace name, that he did no work on the jobs, that the only Ace assets used were its name and insurance, and that no Ace personnel worked on the jobs. N.T. 8/10/15 Vol. 2 pp. 91-93.

c. Baranowski's testimony and report conclude that the economic benefit Polites received from those jobs totaling $ 37,095.54 was an Ace asset due to his use of the Ace name, insurance and other assets. N.T. 8/11/15 Vol. 3 pp.48-51; Def.'s Ex. NN pp. 12-14.

d. Baranowski testified that she had not reviewed the LBW books or obtained any information from Polites relative to these jobs and so could not determine the expenses incurred by LBW relative to them. N.T. 8/11/15 Vol. 3 pp. 92-94; N.T. 8/11/15 Vol. 4 pp. 5-13.

e. Baranowski testified that LBW paid all the payroll, workers compensation insurance, and liability insurance premiums associated with the jobs. N.T. 8/11/15 Vol. 4 pp. 12-13; Pl.'s Exs. 54, 55.

63. Based upon the evidence presented the Court finds that Ace enjoyed no economic benefit or loss from these pass through jobs and so Contorchik's claim related to them fails.

64. Relative to Contorchik's claim for additional capital contributions:

a. Contorchik testified that when the partnership was formed he contributed his mother's 1979 backhoe as well as his personal pickup truck as part of his capital contribution. N.T. 8/10/15 Vol. 2 pp. 64-65.

b. Contorchik testified that the backhoe was traded in during the purchase of a newer one and that the truck was eventually sold with the proceeds used to purchase a small trailer, and that he was never compensated for the purchase of the trailer. Id. pp. 65-66.

c. Polites did not contest that the partnership used and eventually traded in the two vehicles to purchase new equipment. N.T. 8/10/15 Vol. 1 p. 90-91.

d. Polites could not recall if Contorchik was ever credited with the assets value. Id.

e. Baranowski testified that based on the information received from Contorchik and her review of the partnerships records she could not determine if the backhoe and pickup were ever credited to Contorchik's capital account. N.T. 8/11/15 Vol. 3 pp. 51-55; Def.'s Ex. NN pp. 14-15.

65. The Court finds that Contorchik contributed the backhoe and pickup to Ace as part of his initial capital contribution which was never recognized in the Ace financial records.

66. Accordingly, Contorchik is entitled to a credit for $12,500.00. The Court notes that no value was placed on the pickup by Contorchik and so no credit can be awarded for it.

67. As to Contorchik's claim for a capital account equalization payment of $ 7,358.00

a. The evidence of record reveals that Contorchik's capital account had a negative balance of $ 20,479.00 while Polites' capital account had a negative balance of $ 27,837.00. Pl.'s Ex. 57; Def.'s Ex. NN.

b. Baranowski testified that this difference represented either an additional $ 7,358.00 in contributions by Contorchik or additional draws by Polites. N.T. 8/11/15 Vol. 3 p. 56.

68. The evidence establishes that Contorchik is entitled to an equalization credit of $ 7,358.00 from Polites.

69. Contorchik is entitled to a total credit of $12,500.00 + $ 7,358.00 = $19,858.00.

70. Taking into account Contorchik's credit owed by Polites, Polites is entitled to $68,493.20 - $ 19,858 = $ 48,635.20.

**Accordingly, the following Decision is entered:**

**CIVIL DIVISION**

| | | |
|---|---|---|
| TIMOTHY J. POLITES, | * | |
| | * | |
| Plaintiff, | * | No. 2009-3148 |
| | * | |
| vs. | * | |
| | * | Findings of Fact, Conclusions of Law |
| DAVID CONTORCHIK, | * | and Decision |
| | * | |
| Defendant. | * | |

# <u>DECISION</u>

**AND NOW**, this 11th day of April 2016, for the reasons outlined in the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, DIRECTED, AND DECREED** that a decision is entered in favor of the Plaintiff and against the Defendant in the amount of $ 48,635.20. A judgment against the Defendant in favor of the Plaintiff in the amount of $ 48,635.20 is hereby entered.

It is **FURTHER ORDERED, DIRECTED, AND DECREED** that the Court's order of March 23, 2015, imposing costs is **VACATED**.

**BY THE COURT:**

Norman A. Krumenacker, III, J.

**IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA**
CIVIL DIVISION

| | | |
|---|---|---|
| TIMOTHY J. POLITES, | * | |
| | * | |
| Plaintiff, | * | No. 2009-3148 |
| | * | |
| vs. | * | |
| | * | Rule of Appellate Procedure 1925(a) |
| DAVID CONTORCHICK, | * | Opinion |
| | * | |
| Defendant. | * | |
| | * | |

# RULE OF APPELLATE PROCEDURE 1925(a)(1) OPINION

**Krumenacker, P.J.:** The Defendant, David Contorchick (Contorchick), appeals from this

Court's April 11, 2016, Findings of Fact, Conclusions of Law, and Decision entered

following a two day non-jury trial that occurred August 10-11, 2015, in this partnership

dissolution action. The essential facts are that the Contorchick and Timothy Polites (Polites)

parties entered into a partnership agreement (Agreement) on March 26, 1993, for the purpose

of operating a business in the name of Ace Excavating (Ace). N.T. 8/10/15 Vol. 1; Pl.'s Ex. 1.

Pursuant to the Agreement, the parties were 50/50 partners in Ace, were to share equally in

any profits or losses and were equal owners of all partnership assets. Pl.'s Ex. 1. The

Agreement provided that neither partner could sell, assign, transfer, encumber, or otherwise

dispose of any partnership property without the consent of the other partner and that any such

action would be void. Pl.'s Ex. 1 Art. IV.

In early 2007, Polites became aware that Contorchick had informed others that Ace

was no longer in business and further learned that Contorchick was using Ace assets to

conduct business under the name Contorchick Excavating. N.T. 8/10/15 Vol. 1 pp. 17, 20;

Pl.'s Exs. 2, 3. After learning this Polites, informed Contorchick by letter that Ace assets were only to be used on Ace jobs. N.T. 8/10/15 Vol. 1 p. 20; Pl.'s Ex. 3. Contorchick ignored Polites' letter, continued using Ace assets for Contorchick Excavating jobs, and eventually converted all Ace assets over to his new enterprise, including transferring title to all Ace vehicles and equipment. Id.; N.T. 8/10/15 Vol. 2 pp. 101-04. Contorchick Excavating was operated from the same location that formerly housed Ace. Pl.'s Exs. 7, 8. N.T. 8/10/15 Vol. 1 pp. 25-26. Contorchick admitted that in 2007 he began operating Contorchick Excavating using the partnership assets and that he transferred title to various vehicles and equipment from Ace to Contorchick Excavating without Polites' consent. N.T. 8/10/15 Vol. 2 pp. 101-04.

Following trial, the parties were afforded the opportunity to submit proposed findings of fact and conclusions of law which both did following the completion of the transcripts. Upon review of the evidence presented and the parties' suggested findings, the Court, *inter alia*, determined that Contorchick had wrongfully dissolved the partnership, wrongfully transferred title of Ace assets to his new business, and that Polites was due $48,635.20 from Contorchick for his 50% interest in Ace. The Decision did not award Polites interest under the damages provision of section 8360(b)(1)(ii) of the Uniform Partnership Act (UPA) as the interest calculation presented by Polites was based on improper interest rates and not warranted under the circumstances. See, Remic v. Berlin, 284 Pa. Super. 489, 426 A.2d 153 (1981) (when dissolution of partnership is caused in contravention of the partnership agreement, each partner who has not caused dissolution wrongfully shall have the right to damages against each partner for breach of the agreement; safest and fairest way for court to

decide questions pertaining to interest is according to a plain and simple consideration of justice and fair dealing).

Contorchick filed Post-trial Motions on April 21, 2016, and Polites filed Post-trial Motions on May 5, 2016. A hearing on the Motions was scheduled for May 31, 2016, and, following the hearing, both Motions were denied by Order filed June 29, 2016. Contorchick filed a timely Notice of Appeal and a Concise Statement of Errors Complained of on Appeal (Concise Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925 (West 2016). Contorchick's Concise Statement raises twenty allegations of error that can be grouped into five general allegations:

1. Did the Court err in permitting Donald Kirsch to testify as an expert for Polites and in failing to strike his expert report?

2. Did the Court err in permitting Polites to testify as to the value of certain partnership assets?

3. Did the Court err in using fair market values rather than liquidation value for certain assets?

4. Did the Court err in finding Polites was entitled to *quid pro quo* for insurance payments made for Contorchick, in finding various jobs were pass through jobs, and in vacating an award of costs to Contorchick?

5. Was the Decision manifestly against the weight of the evidence?

In addressing Contorchick's twenty allegations of error, the Court first observes that "when an appellant raises an extraordinary number of issues on appeal, as in this case, a presumption arises that there is no merit to them." Estate of Lakatosh, 441 Pa. Super. 133, 136 n.1, 656 A.2d 1378, 1380 n.1 (1995) (quoting United States v. Hart, 693 F.2d 286, 287 n.1

(3d Cir. 1982) (quoting Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility-A View From the Jaundiced Eye of One Appellate Judge, 11 Cap.U.L.Rev. 445, 458 (1982)). See also, Commonwealth v. Robinson, 581 Pa. 154, 186 n. 28, 864 A.2d 460, 479 n. 28 (2004); Commonwealth v. Ellis, 534 Pa. 176, 626 A.2d 1137, 1140 (1993) ("[w]hile criminal defendants often believe that the best way to pursue their appeals is by raising the greatest number of issues, actually, the opposite is true: selecting the few most important issues succinctly stated presents the greatest likelihood of success"); Craley v. Jet Equip. & Tools Inc., 778 A.2d 701, 704 n.1 (Pa. Super. 2001); Kenis v. Perini Corp., 452 Pa. Super. 634, 639 n. 3, 682 A.2d 845, 847 n. 3 (1996).

In addition to creating this rebuttable presumption, appellants who file lengthy concise statements run the risk of having some or all of their issues barred for violating Rules of Appellate Procedure 2116 (a) and 2135, this may also result in the dismissal of the appeal under Rule 2101. Pa. Rs.A.P 2101, 2116(a), 2135 (West 2016). This Court believes that guidance is necessary from our appellate courts to trial judges, appellate counsel, and *pro se* litigants concerning the appropriate length of 1925(b) concise statements and in how the trial courts should address such lengthy concise statements such as the one at issue here. Lacking this guidance, the Court will seek to address each of Contorchick's allegations of error.

For the reasons discussed below, the appeal should be dismissed and the Court's Findings of Fact, Conclusions of Law, and Decision of April 11, 2016, should be affirmed.

# DISCUSSION

The Court notes that this Opinion is intended to supplement the Court's April 11, 2016, Findings of Fact and Conclusions of Law (Findings) as many of the twenty issues

raised by Contorchick are addressed therein with the Court's reasons for them being clear. Accordingly, the Court incorporates those Findings herein.

Prior to addressing the issues raised, a review of the Court's role in a non-jury trial is in order. As a general matter, it is well settled that "[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Simmons, 541 Pa. 211, 229, 662 A.2d 621, 630 (1995). This principal applies equally where a judge sits as fact finder in a non-jury trial. Commonwealth v. Davis, 491 Pa. 363, 372, 421 A.2d 179, 183 (1980). On appeal, the appellate court cannot re-weigh the evidence and substitute its judgment for that of the fact-finder in assessing witness credibility. Commonwealth v. Olsen, 82 A.3d 1041, 1046 (Pa. Super. 2013).

### I.    Did the Court err in permitting Donald Kirsch to testify as an expert for Polites and in failing to strike his expert report?

In his first allegation of error, Contorchick contends the Court erred in permitting Donald Kirsch (Kirsch) to testify as an expert witness. Kirsch was offered by Polites as an expert with respect to valuation of the partnership assets based upon his analysis of the partnership's financial records and valuations of certain assets provided by Polites. Contorchick objected to Kirsch's testimony on the basis that he was not an expert in business valuation, relied on data provided by Polites, who was not an expert himself, and that the report was not provided prior to the Court's November 2014 deadline for expert reports and was not listed in Polites' pre-trial narrative. N.T. 8/10/15 Vol. I pp. 5-8.

In response, Polites argued that Kirsch was a licensed CPA and capable of reviewing financial records and other data to value the partnerships assets and liabilities, that the data

provided by Polites did not require any expertise to obtain, and that the Court's December 23, 2014, Order granting Contorchick's Motion *In Limine* to exclude Polites' prior expert allowed Polites to obtain a new expert but set no deadline to do so. Id. pp. 8-12. The Court found that Kirsch was an expert relative to the accounting testimony, that his report was timely under the December 2014 Order, and that the remainder of Contorchick's objections went to the weight to be afforded Kirsch's non-expert testimony not its admissibility.

Kirsch was first identified as an expert for Polites when his expert report was submitted to the Court and Contorchick on March 18, 2015, five days prior to start of trial, which was originally set for March 23, 2015. Immediately before trial on the 23rd, Contorchick objected to the report, requested a continuance to allow his expert to review the report, and sought an award of costs for the delay caused by Polites' late filing. By Order issued that date the trial was continued and Polites was ordered to pay Contorchick's costs. By letter directed to Polites' counsel on March 27, 2015, Contorchick sought costs of $4,745.75 broken down as: expert fee for Robert Walls (Walls) $325; attorney's costs of $1,247.75; and expert costs for Heather Baranowski (Baranowski) of $3,173. On April 1, 2015, Polites filed for reconsideration of the award of costs and, by Order issued that date, the award was stayed pending a hearing on the motion at trial. By way of Motion filed July 30, 2015, Contorchick renewed his objections to Kirsch's testimony with the hearing on the Motion occurring as outlined above prior to the start of trial.

It is well-established that "expert opinion testimony is proper only where formation of an opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror." Commonwealth v. Carter, 403 Pa. Super. 615, 618, 589 A.2d 1133, 1134 (1991). Here expert testimony was, as the parties agree, necessary relative to the analysis of

financial records and certain aspects of valuation. The rule for qualifying and providing testimony as an expert witness, found in Rule of Evidence 702, is as follows:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa. R.E. No. 702 (West 2016). Our Supreme Court has explained that

> It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. ... It is also well established that a witness may be qualified to render an expert opinion based on training and experience. ... Formal education on the subject matter of the testimony is not required ... nor is it necessary that an expert be a licensed medical practitioner to testify with respect to organic matters. ... It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field ... only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience. ...

Miller v. Brass Rail Tavern, Inc., 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995) (emphasis in original) (internal citations omitted). See also, Reading Radio, Inc. v. Fink, 833 A.2d 199, 207 (Pa. Super. 2003).

The evidence established that Kirsch is a licensed CPA and has been practicing as a CPA since 1964, thus, it is beyond question that he "has any reasonable pretension to specialized knowledge on the subject" of accounting and financial reports. Pl.'s Ex. 57. Further, it is well settled that the Rules of Evidence governing expert and lay testimony do not preclude a single witness from testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder. Commonwealth v. Huggins, 68 A.3d 962 (Pa. Super. 2013). The Rules of

Evidence do not specifically delineate that a witness must be only an expert witness or a lay witness, but instead, the witness' association to the evidence controls the scope of admissible evidence that he or she may offer, and rule governing opinion on ultimate issue permits both expert and lay opinion testimony on issues that ultimately must be decided by the trier of fact. Id. Accordingly, Kirsch could offer both expert opinion on financial matters and lay opinion as to other matters with the weight of such evidence to be determined by the Court as trier of fact.

Finally, Rule 703 provides that

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703 (West 2016). This permits experts to rely upon information provided by others to the extent that a person in their field would reasonably do so. Thus, as to the issue of Kirsch's reliance on values provided by Polites for small equipment and heavy machinery owned by Ace, such reliance was proper as Kirsch indicated it was normal practice to do so. N.T. 8/10/15 Vol 2 pp. 29-30, 34-35; Pl.'s Ex. 57. This testimony related was supported by the testimony of Contorchick's expert on valuation, Baranowski, who testified that she relied on equipment valuations provided in part by Contorchick himself and in part by his equipment valuation expert, Walls, and that she applied no special accounting methodology to her valuation and did not speak to Walls relative to his valuation. N.T. 8/11/15 Vol 3 pp. 35, 83, 86-87, 89; Def.'s Ex. NN. Accordingly, there is no merit to this allegation of error.

**II.      Did the Court err in permitting Polites to testify as to the value of certain partnership assets?**

In his second allegation of error, Contorchick alleges the Court erred in permitting Polites to testify as to the value of the partnership's tools/small equipment and the heavy machinery since valuing such equipment requires expertise not possessed by Polites.

As to the tools/small equipment, there was no error in permitting Polites to testify as to their value since, as a partner in the business and its bookkeeper, he was aware of the costs of the items and their relative value. Indeed, both Polites and Contorchick provided the values of the partnership's tools/small equipment used by their respective experts. N.T. 8/10/15 Vol 2 pp. 29-30, 34-35; Pl.'s Ex. 57; N.T. 8/11/15 Vol. 3 pp. 83, 86-87, 89; Def.'s Ex. NN. Further, the Court did not accept either valuation as definitive but, instead, averaged the values to reach a fair market value of the tools/small equipment as no independent appraisal was provided. Findings Nos. 21-22.

As to the heavy machinery, Polites testified that he used the average value of actual sales of similar machinery on the Machinery Trader website to establish his values and that he did not have access to the equipment to have it appraised in 2007. N.T. 8/10/15 Vol. 1 pp. 39-40, 43. Kirsch testified that this was an acceptable method of valuation of such assets, N.T. 8/10/15 Vol. 2 p. 35, and that he employed a similar approach but used the website Top Bid. N.T.8/10/15 Vol. 2 p. 16; Pl.'s Ex. 57 Schedules I and II. Walls, Contorchick's equipment appraiser, testified that he also used the Machinery Trader website to obtain his values for the heavy equipment but that he used wholesale values rather than actual sale data and that he modified the values obtained based on his physical inspection and appraisal of the equipment. N.T. 8/10/15 Vol. 2 pp. 59-63. Walls testified that the values he used were the values he or another person would be willing to pay for the equipment with the intention of reselling it for a profit. Id. pp. 59-60. Finally, on re-direct, Walls testified that a lay person could use the

Machinery Trader website to obtain values for the equipment but would lack his expertise in appraising equipment and adjusting for the condition of the equipment. Id. pp. 62-63. In sum, Walls' testimony establishes that the source used by Polites was proper and that any person can read and interpret the sales data.

The Court did not err in permitting Polites to testify as to these values were he had personal knowledge of the value of the tools/small equipment, Contorchick provided similar valuations to his expert, and Walls testified that he utilized the same source for his values as Polites did but relied on the lower wholesale value to allow a buyer to make a profit when they resold the equipment. Accordingly, there is no merit to this allegation of error.

### III. Did the Court err in using fair market value rather than liquidation value of certain assets?

In his third allegation of error, Contorchick alleges the Court erred in applying the fair market value rather than the wholesale or liquidation value to the partnership's assets. Partners generally owe a fiduciary duty to one another. Clement v. Clement, 436 Pa. 466, 260 A.2d 728, 729 (1970) (citations omitted). See also, Bracht v. Connell, 313 Pa. 397, 170 A. 297, 299 (1933) ("Partners stand in a fiduciary relationship to copartners."). In this regard, our Supreme Court has explained that

> one should not have to deal with his partner as though he were the opposite party in an arms-length transaction. One should be allowed to trust his partner, to expect that he is pursuing a common goal and not working at cross-purposes. This concept of the partnership entity was expressed most ably by Mr. Justice, then Judge, Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928):
>
>> 'Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of

> the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.'

Clement, 436 Pa. at 468-69, 260 A.2d at 729 (internal citations omitted). See also, Weston v. Northampton Pers. Care, Inc., 62 A.3d 947, 1010–11 (Pa. Super. 2013).

Throughout the windup period, partners have a fiduciary duty to act in good faith toward one another and complete the "unfinished business" of the partnership without any additional compensation for this activity. See, 15 Pa. C.S. §§ 8331, 8334(a), 8352; Clement, 436 Pa. 466, 260 A.2d 728. In detailing the fiduciary duty partners owe one another during the winding up of a partnership, our Supreme Court explained that

> Where a partner of a dissolved partnership is charged with the responsibility of selling assets for his fellow partners, **his primary responsibility is to obtain the highest possible price for the assets. Once that partner begins to show interest in the properties as a potential buyer, however, he has compromised his duty to his fellow partners in favor of his own interests and it is improper for him to continue to act as fiduciary for his partners,** without the full knowledge and consent of all the partners.

Hankin v. Hankin, 507 Pa. 603, 612, 493 A.2d 675, 679 (1985) (emphasis added). Here, as outlined in the April 11 Findings, Contorchick violated this duty and wrongfully dissolved the partnership by transferring all its assets to his new enterprise while avoiding paying Polites his share due under both the Agreement and the UPA. See, Findings Nos.1-18.

Contorchick's argument relative to valuation is premised on Article 5.3 of the Agreement which provides

> Upon termination of the partnership, no further business shall be conducted in the partnership name except for the taking of such action as is necessary or appropriate for the completion of incomplete transactions, discharge of the partnership debts and liabilities, winding up and liquidations of its affairs and distribution of its assets.

Pl.'s Ex. 1 Art V. Contorchick reads the word "liquidations" in Article 5.3 to mean "liquidation value" despite the absence of that exact language. Contorchick's reading is not supported by the plain language of the Agreement, logic, or the law of the Commonwealth.

As to the language, Article 5.3 does not say "liquidation value" but speaks in terms of liquidation of the partnership's assets in order to discharge its debts and eventually distribute any remainder to the partners under the terms of the Agreement or the UPA. The plain language of Article 5.3 does not require the assets be sold at their liquidation value but, rather, speaks only of the ability of the partners to liquidate the partnership's assets post dissolution. Further, Contorchick's argument logically fails as it is the practice of those in business to maximize their profits by obtaining the highest price for their goods and services not the lowest price.

Further, under the circumstances here, where one partner wrongfully dissolved the partnership, the wrongful partner may not participate in the winding up of the partnership or sale of its assets. As such, Contorchick had no legal right to engage in any activity relative to the partnership assets. See, 15 Pa. C.S. § 8359; Miernicki v. Seltzer, 312 Pa. Super. 166, 458 A.2d 566 (1983) (client, having wrongfully ejected his brother from the partnership which owned lands which were subsequently condemned, had no authority to wind up partnership affairs following dissolution and client's brother was not bound by unilateral acts of client after dissolution such as hiring of counsel for representation in eminent domain proceeding;

rather, after dissolution of the partnership, all lands were owned by brothers as tenants in common).

Under <u>Hankin</u> it is clear that when a partnership is dissolved, it is the duty of the partners to obtain the highest value for each asset and not accept a fire-sale or wholesale value where a higher value can be obtained. The values provided by Contorchick were below the average prices of actual sales and would have given him a windfall by permitting him to obtain the equipment for less than its actual value. Finally, the Court found Contorchick's values lacked credibility as they were intended to provide the lowest possible valuation to reduce his liability to Polites following the wrongful dissolution of the partnership and conversion of the partnership's assets. Accordingly, there is no merit to this allegation of error.

**IV.**     **Did the Court err in finding Polites was entitled to *quid pro quo* for insurance payments made for Contorchick, in finding various jobs were pass through jobs, and in vacating an award of costs to Contorchick?**

In his fourth allegation of error, Contorchick alleges that the Court made three separate errors when it:

1. Determined Polites was entitled to matching SEP contributions equal to the partnership's payments for Contorchick's life insurance premiums.

2. Determined that jobs bid under the Ace name by Polites, but performed by his separate company LBW, were "pass through" jobs that resulted in no economic benefit to Ace.

3. Vacated the March 23, 2015, award of costs outlined in Part I, *supra*.

As to the issue of whether Polites was entitled to receive a credit equivalent to the payments made by Ace for Contorchick's insurance premiums, the Court made the following findings:

50. As to the claim for SEP contributions:
    a. Polites testified that the parties agreed that Ace would make life insurance payments for Contorchick and in lieu of a similar policy for Polites, Ace would make matching contributions to Polites SEP account; N.T. 8/10/15 Vol. 1 pp. 53-54, 106-08.

    b. Polites testified that Ace made payments on a policy for Contorchick totaling $7,722.00 over the years 1994-2006. Id.; Pl.'s Exs. 35, 57.

    c. Polites testified that no matching payments were made. N.T. 8/10/15 Vol. 1 pp. 53-54, 106-08.

    d. Contorchick testified that while the parties did discuss life insurance premiums for him there was no agreement to make matching SEP contributions for Polites. N.T. 8/11/15 Vol. 2 pp. 84-85.

51. The Court finds Polites testimony in this regard credible as it is unlikely one party to an agreement will provide a benefit to the other without some form of *quid pro quo.*

52. Accordingly, Polites is entitled to a credit of $3,861.00 representing 50% of the $7,722 in life insurance premiums paid by Ace under section 8311. 15 Pa. C.S. § 8331; Pl.'s Ex. 57.

Findings Nos. 50-52. These Findings and the award of a credit of $3,861.00 were not in error as the Court found Polites' testimony with regard to the partners' agreement that the partnership would pay Contorchick's life insurance premiums and make a matching SEP contribution for Polites credible. Further, as noted in Finding 51, it is unlikely Polites would have agreed to have Ace pay insurance premiums for Contorchick without an equivalent benefit for himself. These conclusions are without error as there was no evidence presented other than Contorchick's self-serving testimony to the contrary which the Court found lacked credibility.

As to the issue of the pass through jobs, at trial Contorchick argued he was entitled to the economic benefit in the amount of $37,095.54 for two jobs conducted by Polites through his separate company LBW but bid under the Ace name. The Court found that such a credit was not owed as no Ace employees worked on the jobs, no Ace assets were used on the jobs, and all costs were born by LBW. Specifically, the Court made Finding 62 and 63 that read:

62. As to the claim for economic benefit:
   a. Polites testified that the jobs in question were "pass through" jobs bid under the Ace name with all expenses paid for and work performed by LBW using no Ace assets or personnel. N.T. 8/10/15 Vol. 1 pp. 67-82; Pl.'s Exs. 50-55.

   b. Contorchick testified that he objected to the two jobs being bid under the Ace name, that he did no work on the jobs, that the only Ace assets used were its name and insurance, and that no Ace personnel worked on the jobs. N.T. 8/10/15 Vol. 2 pp. 91-93.

   c. Baranowski's testimony and report conclude that the economic benefit Polites received from those jobs totaling $37,095.54 was an Ace asset due to his use of the Ace name, insurance and other assets. N.T. 8/11/15 Vol. 3 pp.48-51; Def.'s Ex. NN pp. 12-14.

   d. Baranowski testified that she had not reviewed the LBW books or obtained any information from Polites relative to these jobs and so could not determine the expenses incurred by LBW relative to them. N.T. 8/11/15 Vol. 3 pp. 92-94; N.T. 8/11/15 Vol. 4 pp. 5-13.

   e. Baranowski testified that LBW paid all the payroll, workers compensation insurance, and liability insurance premiums associated with the jobs. N.T. 8/11/15 Vol. 4 pp. 12-13; Pl.'s Exs. 54, 55.

63. Based upon the evidence presented the Court finds that Ace enjoyed no economic benefit or loss from these pass through jobs and so Contorchick's claim related to them fails.

Findings 62-63. The Court's conclusion is amply supported by the evidence presented at trial that the jobs, while bid under the Ace name, were fully funded and performed by LBW and that no Ace assets were used on the jobs resulting in Ace not being entitled to benefit from LBW's work. Baranowski's testimony at trial, after reviewing some material she did not have

during the preparation of her report, altered her initial conclusions and supports the Court's decision. N.T. 8/11/15 Vol. 3 pp. 92-94; N.T. 8/11/15 Vol. 4 pp. 5-13; Pl.'s Exs. 54, 55.

Finally, Contorchick argues the Court erred in vacating the March 23rd Order imposing costs on Polites. As noted above, Polites first identified Kirsch as his expert witness when his report was submitted to the Court and Contorchick on March 18, 2015, five days prior to start of trial on March 23. Immediately before trial on the 23rd, Contorchick objected to the report, requested a continuance to allow his expert to review the report, and sought an award of costs for the delay caused by Polites' late filing. By Order issued that date, the trial was continued and Polites was ordered to pay Contorchick's costs. By letter directed to Polites' counsel on March 27th, Contorchick sought costs of $4,745.75 broken down as follows: expert fee for Walls of $325; attorney's costs of $1,247.75; and expert costs for Baranowski of $3,173. On April 1, Polites filed for reconsideration of the award of costs and, by Order issued that date, the award was stayed pending a hearing on the motion at trial.

Following the close of testimony, the parties addressed Polites' Motion for Reconsideration. N.T. 8/11/15 Vol. 3 pp. 38-45. During argument, Polites' counsel, Timothy Sloan (Sloan), indicated he retained Kirsch on January 8, 2015, following the pre-trial conference held December 22, 2014, and subsequent Order excluding his initial expert but did not know Kirsch was leaving the next day for a six week vacation. Id. p. 39. As a result, he did know he would not receive the expert report until late and immediately upon receipt of the report faxed it to the Court and opposing counsel. Id. Sloan argued that the report was not complicated and could be easily reviewed by counsel and/or Baranowski prior to March 23, Baranowski apparently reviewed the report given her invoice, and counsel had ample time, three working days plus the weekend, to determine if a continuance would be needed during

which time they could have contacted Sloan or the Court to avoid the need to appear on the 23rd. Id. pp. 38-42. Finally, Sloan argued the amount sought $4,745.75 was excessive given the short time, three hours, the parties and witnesses were present on the 23rd and included Baranowski's fee for preparing her report which was not proper. Id. p. 41.

In response, Contorchick's counsel, James Silsley (Silsley) argued the Kirsch report was not covered by the December 22nd Order as it addressed other matters, the three work day window was insufficient time to review the report, he contacted the Court the Friday before trial but was informed this Jurist was out of the office, and the fees and costs asserted were reasonable under the circumstances. Id. pp. 42-45.

The relevant standard of review governing review of an award or disallowance of attorney fees by a trial court has been well stated by our Supreme Court, to wit:

> Appellate review of a trial court's order awarding attorney's fees to a litigant is limited solely to determining whether the trial court palpably abused its discretion in making a fee award. *In re* Estate of Liscio, 432 Pa. Super. 440, 444, 638 A.2d 1019, 1021 (1994), *appeal denied,* 539 Pa. 679, 652 A.2d 1324 (1994). If the record supports a trial court's finding of fact that a litigant violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal. Id.

Thunberg v. Strause, 545 Pa. 607, 614–615, 682 A.2d 295, 299 (1996). Under Pennsylvania law, the default rule is that litigants bear responsibility for their own costs and attorneys' fees in the absence of express statutory authorization for fee awards, contractual fee-shifting, or some other recognized exception. See, Herd Chiropractic Clinic, P.C. v. State Farm Mut. Auto. Ins. Co., 619 Pa. 438, 445, 64 A.3d 1058, 1062–63 (2013); Merlino v. Delaware Cty., 556 Pa. 422, 425, 728 A.2d 949, 951 (1999) (citing Chatham Commc'ns, Inc. v. Gen. Press Corp., 463 Pa. 292, 300–01, 344 A.2d 837, 842 (1975)).

Upon review of the record, the Court concluded that the award of costs and fees was not warranted where Silsley had the opportunity to review the Kirsch report before trial and knew on March 20th there was an issue to be addressed based on his attempt to contact the Court on that date. Silsley made no effort to contact Sloan on the 20th to discuss the issue and seek to either resolve the matter or agree to a continuance. Further, Silsley could have altered his witness schedule to prevent Baranowski from being present on the 23rd, particularly in light of his knowledge that he would be challenging Kirsch's report which may result in a delay of the trial. The Court further determined the amount sought for attorney and witness fees was unreasonable given the less than three hours they were present in court and included Baranowski's report preparation and other expenses.

Further, Sloan's conduct was not dilatory, obdurate or vexatious as required by section 2503(7) of the Judicial Code that governs the right of participants to receive counsel fees based upon conduct of counsel of the party. 42 Pa. C.S. 2503. The Court's prior Orders and discussion with counsel permitted the filing of a new expert but failed to specify a date certain to file such report and so it would be improper to penalize Polites or Sloan for filing Kirsch's report "late" where there was no deadline to file it and, thus, such conduct could not be dilatory, obdurate or vexatious as required by section 2503(7) where there was no evidence of wrongful intent. 42 Pa. C.S. § 2503. Finally, the Court notes that it did not find Sloan in contempt on March 23rd and that there is no other statutory provision permitting the award of attorney's fees and costs under these circumstances. See, 42 Pa. C.S. §§ 1726, 2503; Berg v. Georgetown Builders, Inc., 822 A.2d 810, 816 (Pa. Super. 2003). As such, the award was improper and properly vacated. Accordingly, there is no merit to these issues.

## V. Was the Decision against the weight of the evidence?

In his final allegation of error, Contorchick argues that the Court's decision was against the weight of the evidence in three areas. First, Contorchick argues the Court's decision to reduce the Ace debt obligation by $28,178.49 representing payments made in 2007 was not supported by the evidence. Second, Contorchick asserts the award of $29,711.92 due to LBW as intercompany transfer is not supported by the evidence. Finally, Contorchick asserts there is no evidence to support the conclusion that Ace did not benefit economically from the pass through jobs.

A challenge to the weight of the evidence *concedes* that the evidence was sufficient to sustain the verdict. Commonwealth v. Davis, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed in the first instance to the discretion of the trial court. Commonwealth v. Dupre, 866 A.2d 1089, 1101 (Pa. Super. 2005) (citing Commonwealth v. Sullivan, 820 A.2d 795, 805-806 (Pa. Super. 2003) (quoting Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 751-752 (2000))). The Pennsylvania Supreme Court has explained that "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." Widmer, 744 A.2d at 753 (citation omitted).

For a decision to be against the weight of the evidence it must be shown that the evidence relied on to reach the decision was so inherently improbable or at variance with the admitted or proven facts, or with ordinary experience, that it resulted in a decision that is shocking to the court's sense of justice. Thomas v. E.B. Jermyn Lodge No. 2, 693 A.2d 974 (Pa. Super. 1997). See also, Commonwealth v. La, 433 Pa.Super. 432, 461, 640 A.2d 1336, 1351 (1994) (for a new trial to be awarded on a weight challenge, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court."). While an

appellate court will review the evidence, determinations pertaining to the credibility of witnesses and the weight to assign evidence are matters within exclusive province of the fact finder and may not be disturbed by the appellate court. Weir by Gasper v. Estate of Ciao, 521 Pa. 491, 556 A.2d 819 (1989).

Accordingly, where the credibility of a witness is at issue in a weight challenge, the trial court's judgment will remain undisturbed on appeal unless the source of the evidence is so unreliable or contradictory that it renders a verdict thereon pure conjecture. Commonwealth v. Rochon, 398 Pa. Super. 494, 504, 581 A.2d 239, 244 (1990); Commonwealth v. Whack, 482 Pa. 137, 140, 393 A.2d 417, 419 (1978). As our Superior Court has explained

> Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

In re: E.P., J.P. & A.P., 841 A.2d 128, 131 (Pa. Super. 2003) (quoting In re: R.W.J., 826 A.2d 10, 12 (Pa. Super. 2003)). A court may not reverse the fact finders' determination unless it is "so contrary to evidence as to shock one's sense of justice." Simmons, 541 Pa. 211, 229, 662 A.2d 621, 630.

In assessing the trial court's denial of a new trial based on a weight challenge, the appellate court must "review [ ] the trial court's exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence." Commonwealth v. Smith, 604 Pa. 126, 985 A.2d 886, 888 (2009). Since the fact-finder is free to believe all, part, or none of the evidence a court will not make its own assessment of the credibility of the evidence and "[t]he trial court will only award a new trial when the jury's verdict is so

contrary to the evidence as to shock one's sense of justice." <u>Commonwealth v. Ramtahal</u>, 613 Pa. 316, 33 A.3d 602, 609 (2011). In turn, an appellate court will reverse a trial court's refusal to award a new trial only when it finds that the trial court abused its discretion in not concluding that the verdict was so contrary to the evidence as to shock one's sense of justice. <u>Olsen</u>, 82 A.3d 1041, 1049. <u>See also,</u> <u>Commonwealth v. Whitney</u>, 511 Pa. 232, 239, 512 A.2d 1152, 1155 (1986) (a trial court's decision to deny a new trial will only be reversed if the verdict is so contrary to the evidence as to shock one's sense of justice).

When reviewing a claim regarding the weight of the evidence, the Superior Court has announced the following standard:

> A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [fact-finder], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.
>
> We stress that if there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party.

<u>Winschel v. Jain</u>, 925 A.2d 782, 788 (Pa. Super. 2007) (internal quotations and citations omitted). In effect, "the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." <u>Ramtahal</u>, 613 Pa. 316, 33 A.3d 602, 609.

Where the trial court has determined that a verdict is not against the weight of the evidence and does not award a new trial, that decision is reviewed for an abuse of discretion.

Olsen, 82 A.3d 1041, 1049. In reviewing a decision for abuse of discretion, appellate courts are bound by the facts as found by the trial court unless they are not supported in the record. *In re:* A.P., 728 A.2d 375, 378 (Pa. Super. 1999) (citation omitted). See also, Commonwealth v. Holley, 945 A.2d 241, 246 (Pa. Super. 2008) (appellate court cannot substitute its judgment for that of the trier of fact). An abuse of discretion is not merely an error in judgment but exists only when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, or where the court has failed to apply the law or was motivated by partiality, prejudice, bias, or ill will. Harman v. Borah, 562 Pa. 455, 756 A.2d 1116 (2000). See also, Van Dine v. Gyuriska, 552 Pa. 122, 713 A.2d 1104 (1998); Rebert v. Rebert, 757 A.2d 981 (Pa. Super. 2000).

First, Contorchick argues the Court's decision to reduce the Ace debt obligation by payments made in 2007 totaling $28,178.49 was not supported by the evidence. Contorchick contends that the 2007 payments should not count as Ace was dissolved in 2006 as evidenced by the parties agreeing to a December 31, 2016, dissolution date. Further, he argues that any payments made in 2007 were made solely by Contorchick with assets other than Ace assets or through funds solely generated by him. Contorchick's argument that Ace was dissolved in 2006 is correct; however, dissolution of a partnership does not equate with the termination of the partnership which continues until the winding up of the partnership's affairs is completed. North Star Coal Co. v. Eddy, 442 Pa. 583, 277 A.2d 154 (1971) (even after dissolution, a partnership is not terminated but continues to exist until winding up of partnership affairs is completed, and authority remains to act for the partnership in winding up partnership affairs and completing transactions begun but not yet finished at time of dissolution).

The Superior Court has explained that

> The termination of a partnership is markedly different from the dissolution of a partnership. When a partnership has terminated it ceases doing business; when a partner effects a dissolution it simply means that partner is no longer associated with the business of the partnership.

Canter's Pharmacy, Inc. v. Elizabeth Associates, 396 Pa. Super. 505, 511, 578 A.2d 1326, 1329 (1990). The Court in Canter's noted that

> The authors of the Uniform Partnership Act suggest the following delineation in distinguishing among various terms which apply to that process which leads to the final settlement of all partnership affairs: "Dissolution" designates that point in time when the partners cease to carry on the business together; "termination" is the point in time when all the partnership affairs are wound up; and "winding up" or "liquidation" is the process of settling partnership affairs after dissolution. This is judicially recognized as the correct sequence of events.

Id., at 511 n.4, 578 A.2d at 1329 n.4 (citing 59A Am Jur 2d § 809, comment.). This distinction is codified in section 8532 of the UPA which provides "[o]n dissolution, the partnership is not terminated but continues until the winding up of partnership affairs is completed." 15 Pa. C.S. § 8352. Section 8359 provides that "[u]nless otherwise agreed, the partners who have not wrongfully dissolved the partnership, or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs ...." 15 Pa. C.S. § 8359. It is therefore clear that the date of dissolution is not the same as the date of termination of the partnership and valuation is properly done upon the completion of the winding up phase when all assets and liabilities will be finalized.

The parties agreed to use December 31, 2006, as the date of dissolution with the winding up of operations occurring in 2007 when Contorchick finally converted all of Ace's assets and ceased using the name. N.T. 8/10/15 Vol. 1 p. 83, Vol. 2 pp. 79, 81. The evidence shows that Contorchick continued to operate Ace to finish jobs already underway, made payments on Ace's debt during 2007, and filed 2007 income tax returns for Ace. N.T. 8/10/15

Vol. 2 pp. 81, 99-100, 104; Pl.'s Ex. 33. Thus, the evidence establishes that Ace continued to operate into 2007 and so 2007 is the proper year in which to determine the valuation of Ace's assets and liabilities. The Court notes that the parties did not present full records of the 2007 assets and liabilities and instead relied on 2006 values. That decision by the parties does not prevent the Court from using the correct date of termination nor from relying on such evidence as was presented to accurately determine Ace's value as of the 2007 date of termination.

The evidence established that Ace's debt was paid down by $28,178.49 in 2007 reducing it from the December 31, 2006, total of $129,099 to a 2007 total of $100,920.51 during Contorchick's unauthorized winding up of Ace's business and transfer of its assets to Contorchick Excavating. N.T. 8/10/15 Vol. 1 pp. 47-51; Pl.'s Ex. 33; Findings 40-44. Contorchick contends that he either paid the debt using assets other than Ace's or it was his sole efforts that resulted in Ace generating funds to pay down the debt. As noted above, Contorchick seized control of all Ace's assets and wrongfully continued to act as the decision maker during the winding up phase and, as such, it is expected that he would operate Ace and make necessary payments using Ace assets. Despite the opportunity to do so, Contorchick presented no evidence showing these payments did not occur or that the source of funds was from a source other than Ace. Contorchick was the best person to establish the use of alternate funds and his failure to do so is telling. As the evidence supports the Court's decision, it cannot be said to shock one's sense of justice and warrant a new trial. Simmons, 541 Pa. 211, 229, 662 A.2d 621, 630; Whitney, 511 Pa. 232, 239, 512 A.2d 1152, 1155; Sullivan, 820 A.2d 795, 805-806. Accordingly, as this decision was supported by the evidence and the Court's credibility determinations, it was not in error.

Second, Contorchick asserts that the award of $29,711.92 to LBW as unpaid intercompany transfers is against the weight of the evidence. Testimony revealed that both Polites and Contorchick were engaged in the Ace partnership, as well as other enterprises one of which was Polites' company LBW. N.T. 8/10/15 Vol. 1 pp. 61-66; Pl.'s Exs. 40-49, 57; N.T. 8/11/15 Vol. 4 p. 14. Relative to the relationship between LBW and Ace as it impacted the matter *sub judice*, the Court made the following Findings:

46. As to the intercompany transfers testimony established:
    a. An ongoing relationship between Ace and LBW, as well as LBW's predecessor, existed from 1994 through 2006;

    b. From 1994 until 2000 Ace ran its payroll through LBW;

    c. Beginning in 2000 LBW began running its payroll through Ace;

    d. Ace would occasionally make purchases on LBW accounts.

    N.T. 8/10/15 Vol. 1 pp. 61-66; Pl.'s Exs. 40-49, 57; N.T. 8/11/15 Vol. 4 p. 14.

47. Contorchick offered no evidence to contradict this evidence.

48. Accordingly, the intercompany payment owed by Ace to LBW constitutes a liability of Ace in the amount of $29,711.92. Pl.'s Ex. 57.

49. Polites is entitled to a credit of $14,855.96 representing 50% of this amount payable by Contorchick under section 8311. 15 Pa. C.S. § 8311; Id.

Findings 46-79.

Contorchick is correct that the amount owed by Ace to LBW does not appear as a liability on the Ace books. However, having carefully reviewed all the evidence presented in this matter, it is clear that Ace did not employee the best accounting practices and many items were not in the books or accounted for accurately, including Contorchick's use of Ace assets for his personal use and the repayment of those funds. N.T. 8/11/15 Vol. 1 pp. 57-60; Pl.'s Exs. 36, 38, 39; N.T. 8/11/15 Vol. 2 pp. 108-15; Findings 53-55. It was clear from the

testimony that parties had a very loose bookkeeping system and many transactions were not recorded properly. In concluding that the LBW debt existed, the Court found Polites' testimony on the matter more credible than that on Contorchick and that it was supported by other evidence. See, N.T. 8/10/15 Vol. 1 pp. 61-66; Pl.'s Exs. 40-49, 57; N.T. 8/11/15 Vol. 4 p. 14. Accordingly, as this decision was supported by the evidence and the Court's credibility determinations, it was not in error.

Finally, Contorchick asserts that the conclusion that Ace did not benefit economically from the pass through jobs is against the weight of the evidence. The issues related to the pass through jobs to LBW were addressed in Part III *supra* and, as outlined there, the determination that Ace enjoyed no economic benefit from those jobs was supported by the testimony of Polites, Contorchick and Baranowski. See, Findings 62-63. Accordingly, as this decision was supported by the evidence and the Court's credibility determinations, it was not in error.

For the foregoing reasons and those contained in the Court's April 11, 2016, Findings of Fact, Conclusions of Law, and Decision the appeal should be dismissed and the Court's Decision of April 11, 2016, should be affirmed.

RESPECTFULLY SUBMITTED,

Norman A. Krumenacker, III, P.J

September 22, 2016